541 A.2d 955

AMERICAN TRUCKING ASSOCIATIONS, INC. et al.

v.

Louis L. GOLDSTEIN, et al.

No. 162, Sept. Term, 1987.

Court of Appeals of Maryland.

May 31, 1988.

584

Andrew L. Frey, argued (Kenneth S. Geller, Mark I. Levy, Douglas K. Mayer and Mayer, Brown & Platt, Washington, D.C., C. Christopher Brown and Brown & Goldstein, Baltimore, Daniel R. Barney and Robert Digges, Jr., Alexandria, Va., William S. Busker, Washington, D.C., on brief), for appellants.

Ralph S. Tyler, Asst. Atty. Gen., argued (J. Joseph Curran, Jr., Atty. Gen., Andrew H. Baida, Gerald Langbaum, John K. Anderson, Ben C. Clyburn, Asst. Attys. Gen., Baltimore, on brief), H. Christopher Malone, Sr. Asst. County Atty., argued (Clyde H. Sorrell, County Atty., David J. Frankel, Asst. County Atty., Rockville, on brief), for appellees.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

ELDRIDGE, Judge.

We must decide whether, under the circumstances of this case, the circuit court erred in refusing to enjoin the enforcement of a Maryland tax statute that, according to both the circuit court and the State, violates the Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3.

## I.

The pertinent facts are as follows. Under Maryland's Road Tax on Motor Carriers Act, Code (1957, 1980 Repl. Vol., 1987 Cum.Supp.), Art. 81, §§ 412–429, all motor carriers[1] operating commercial motor vehicles[2] in Maryland must pay certain taxes and fees to support the State's highway system. One provision of the Act, § 423(a), requires that, for fuel tax reporting purposes, motor carriers must register their vehicles on an annual basis with the State Comptroller. For each vehicle thus registered, carriers obtain an "identification marker," which must be displayed on the vehicle in accordance with the Comptroller's regulations. Carriers must purchase a marker for each motor vehicle which they wish to operate in Maryland between January 1 and December 31 of any given year. As a result, the vast majority of markers are purchased in the several months preceding the beginning of the new year; however, carriers might also have to obtain markers during the course of the calendar year if, for example, they purchase new motor vehicles or begin operating in Maryland for the first time.

The annual fee for an identification marker is $25.00 per vehicle.[3] This flat fee applies to all vehicles using Maryland

---

**1.** Art. 81, § 412(c), defines "motor carrier" as "any person who operates or causes to be operated any commercial motor vehicle on any highway of this State."

**2.** Art. 81, § 412(b), defines "commercial motor vehicle" as follows:
  "(b) The term ' *"commercial motor vehicle"* ' means any of the following vehicles that are propelled by motor fuel:
  (1) A passenger vehicle that has seats for more than 15 passengers in addition to the driver;
  (2) A truck tractor as defined in § 11–172 of the Transportation Article;
  (3) A truck having more than 2 axles; [or]
  (4) A truck with 2 axles operating in combination with a freight trailer or semitrailer as defined in § 13–927(c) of the Transportation Article, that has a registered or operating gross combination weight that exceeds 40,000 pounds...."

**3.** In pertinent part, § 423(a) reads:

roads. Thus, § 423(a) takes no account of the actual mileage that any particular vehicle travels in the State.[4]

The plaintiff American Trucking Associations, Inc. (A.T. A.), is a national organization of motor carriers. Along with two individual trucking companies, A.T.A. was certified by the circuit court as the class representative of "all non-Maryland interstate motor carriers" that are subject to the marker tax established by § 423(a). On behalf of this class, A.T.A. maintains that, as applied to such carriers, § 423(a) violates the Commerce Clause.

The original defendants in this case are the state officials who are charged with the duty of collecting and administering the marker tax. In addition, because of their interest in receiving a percentage of the fees generated by § 423(a), 17 counties and Baltimore City have intervened as parties defendant.[5]

In 1984, in an action substantially identical to the instant case, this Court rejected A.T.A.'s argument that § 423(a) unconstitutionally discriminates against interstate commerce. *American Trucking Ass'ns v. Goldstein*, 301 Md.

---

"(a) *Required; identification marker; fee.*—(1) All motor carriers shall obtain an identification marker for each of their commercial vehicles from the Comptroller on an annual basis for the period beginning January 1 of each year and expiring December 31 of each year. The identification marker shall be displayed in accordance with regulations promulgated by the Comptroller. The identification marker shall remain the property of the State of Maryland and may be recalled for any violation of the provisions of this subtitle or of the regulations adopted under this subtitle. Except as provided in paragraph (2) of this subsection, the fee for the issuance of an identification marker is $25.00 per commercial motor vehicle." Under § 423(a)(2), the annual marker fee for motor buses is $10 per vehicle.

4. For a complete account of § 423(a)'s history and underlying purposes, *see American Trucking Ass'ns v. Goldstein*, 301 Md. 372, 376–378, 483 A.2d 47, 49–50 (1984) (*Goldstein I*).

5. Fees collected under § 423(a) constitute "highway user revenues" within the meaning of Code (1977, 1987 Cum.Supp.), § 8–403 of the Transportation Article. Under this section, the State must distribute 30% of such revenues to Baltimore City, the counties, and municipalities within the counties.

372, 483 A.2d 47 (1984) (*Goldstein I*). In reaching that decision, we reasoned that § 423(a) applies equally to all carriers, regardless of whether their vehicles are registered in Maryland or elsewhere and regardless of whether they are engaged in interstate or intrastate commerce, *Goldstein I, supra*, 301 Md. at 386, 483 A.2d at 54. Moreover, we remarked (*ibid.*): "The purpose of § 423(a) is not to protect local carriers against foreign competition; the purpose is to spread evenly among all commercial users the tax burden of supporting Maryland's highway system." A.T.A. had argued that § 423(a)'s "practical effect" is to discriminate against interstate carriers, who might tend to travel fewer miles in Maryland and thus pay a higher per-mile price for an identification marker than would intrastate carriers. In declining to accept this argument, we relied on a line of Supreme Court cases holding that flat taxes similar to § 423(a) do not violate the Commerce Clause. *See Capitol Greyhound Lines v. Brice*, 339 U.S. 542, 70 S.Ct. 806, 94 L.Ed. 1053 (1950); *Aero Mayflower Transit Co. v. Board of Railroad Comm'rs*, 332 U.S. 495, 68 S.Ct. 167, 92 L.Ed. 99 (1947); *Aero Mayflower Transit Co. v. Georgia Public Service Comm'n*, 295 U.S. 285, 55 S.Ct. 709, 79 L.Ed. 1439 (1935).

On June 23, 1987, however, the Supreme Court overruled the above-cited flat tax cases and held that a Pennsylvania marker tax, which was somewhat similar to § 423(a), unconstitutionally discriminated against interstate commerce. *American Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. ——, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987).

In light of the Supreme Court's *Scheiner* decision, A.T.A. filed this action in the Circuit Court for Baltimore City on July 1, 1987. A.T.A. sought a declaration that § 423(a) is unconstitutional, an injunction against future exaction of the marker fee, and refunds for identification markers purchased both before and after the date of *Scheiner*. A.T.A. has since relinquished any claim for fees paid before the date of *Scheiner*.

The defendants conceded that § 423(a) is unconstitutional. Nonetheless, they pointed out to the circuit court that, in reliance on *Goldstein I*, the State had calculated its budget for fiscal year 1988 with the expectation of receiving $12,000,000 in marker fees. Consequently, they argued that, in order to avoid imposing substantial hardships on the State and its political subdivisions, the circuit court should not enjoin enforcement of § 423(a) until the beginning of fiscal year 1989.

On October 22, 1987, the court declared § 423(a) unconstitutional. In addition, however, the court accepted the defendants' claims of detrimental reliance on prior law. Consequently, the court permitted the defendants to continue collecting the marker tax through June 30, 1988, which was the last day of the fiscal year 1988.

As a result of the circuit court's decision, the defendants have been able to impose the $25.00 flat fee for all markers that were purchased for calendar year 1987, even if the tax was not paid until after *Scheiner*, and for the vast majority of identification markers that were purchased for calendar year 1988.

A.T.A. appealed to the Court of Special Appeals, and, before further proceedings in that court, both parties petitioned this Court for a writ of certiorari. Because of the important issue presented, we granted the parties' petitions.

## II.

As previously indicated, the defendants do not dispute that, in light of *Scheiner*, § 423(a) unconstitutionally discriminates against interstate commerce. This Court, however, would not hold a statute unconstitutional simply on the basis of a litigant's concession. Nevertheless, under the *Scheiner* majority's analysis of flat-rate highway taxes, it would seem clear that § 423(a) is inconsistent with the Commerce Clause. Although paying the marker tax affords both interstate and intrastate carriers the same privilege of operating to an unlimited extent on Maryland's

highways, the *Scheiner* Court viewed this privilege as "several times more valuable to" intrastate carriers than to interstate carriers. 107 S.Ct. at 2847. Moreover, the Supreme Court made it clear that the $25 "unapportioned" marker fee is invalid (*ibid.*), and the Court overruled (*id.* at 2845–2847) the flat tax cases upon which *Goldstein I* had relied. *See also Scheiner, supra,* 107 S.Ct. at 2841 n. 17.[6] Therefore, as recognized by the defendant state officials, *Scheiner* had the effect of invalidating § 423(a).

As previously pointed out, A.T.A. has abandoned any refund claim for marker fees paid before the date of the *Scheiner* decision. Furthermore, the defendants agree that, if the circuit court erred in refusing to grant an immediate injunction against enforcement of § 423(a), the plaintiffs are entitled to refunds for all marker fees collected after the date of the *Scheiner* decision. Consequently, this case turns on the question of whether the circuit court acted correctly in delaying the effective date of its decision that § 423(a) was unconstitutional.

### III.

In support of the circuit court's action, the defendants assert that A.T.A. seeks retroactive application of *Scheiner*

---

**6.** This case differs from *Scheiner* in one significant respect. Unlike § 423(a), the Pennsylvania marker tax literally applied only to vehicles registered in other states. Therefore, the economic burden of the Pennsylvania tax fell on non-residents. Consequently, the *Scheiner* Court concluded that the Pennsylvania tax discriminated against non-residents engaged in interstate commerce. *See* 107 S.Ct. at 2839–2841.

As noted above, however, § 423(a) applies to all vehicles, regardless of whether they are registered in Maryland or elsewhere. Thus, Maryland's marker tax does not seem to discriminate in favor of local carriers engaged in interstate commerce and against foreign carriers engaged in interstate commerce. Instead, because the tax is not apportioned according to the number of miles that any particular vehicle travels in the State, it may arguably benefit intrastate carriers at the expense of all interstate carriers. Because § 423(a) does not single out foreign carriers for disparate treatment, such "discrimination" exists against interstate carriers who have registered their vehicles in Maryland as well as interstate carriers registered elsewhere.

and that the circuit court correctly applied the applicable legal standards in concluding that *Scheiner* should receive only prospective effect. In our opinion, however, the defendants' argument evidences a fundamental misunderstanding of the principles governing the prospective or retrospective effect of judicial decisions.

■ In the overwhelming majority of cases, a judicial decision sets forth and applies the rule of law that existed both before and after the date of the decision. In this usual situation, "where a decision has applied settled precedent to new and different factual situations, the decision always applies retroactively." *Potts v. State*, 300 Md. 567, 577, 479 A.2d 1335 (1984). Thus, in the ordinary case, no issue of a "prospective only" application arises. *See, e.g., Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 496, 88 S.Ct. 2224, 2233, 20 L.Ed.2d 1231 (1968); *Houghton v. County Com'rs of Kent Co.*, 307 Md. 216, 220–221, 513 A.2d 291 (1986), and cases there cited.

When, however, a court overrules a prior interpretation of a constitutional or statutory provision, and renders a new interpretation of the provision, the question arises as to whether the new ruling is to operate retroactively or prospectively only. Generally, in determining whether a new interpretation of a federal constitutional provision is to operate retrospectively, a court must assess the various factors set forth in *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), and its progeny. *See* the discussions in *Wiggins v. State*, 275 Md. 689, 698–716 (majority opinion), 732–741 (dissenting opinion), 344 A.2d 80 (1975). *See also* L. Tribe, *American Constitutional Law* § 3–3, at 30–31 & n. 26 (2d ed. 1988). We have essentially followed the teaching of *Linkletter v. Walker, supra*, in deciding whether a new interpretation of a Maryland constitutional provision, statute, or rule, should receive retrospective effect. *See, e.g., State v. Hicks*, 285 Md. 310, 336–338, 403 A.2d 356, 370–371 (1979).

■■ Of course, when, under *Linkletter v. Walker, supra, Wiggins v. State, supra,* and *State v. Hicks, supra,* a new interpretation of a constitutional or legislative provision is to be given only prospective effect, a question arises as to what is meant by "prospective." Generally, in these cases, a "prospective application" of a new interpretation of a constitutional provision, statute, or rule, has included the case before us and all other pending cases where the relevant question has been preserved for appellate review. *See, e.g., McClain v. State,* 288 Md. 456, 470, 419 A.2d 369, 375 (1980). *See also Potts v. State, supra,* 300 Md. at 576–583, 479 A.2d at 1340–1343; *State v. Hicks, supra,* 285 Md. at 338, 403 A.2d at 371.[7]

■■ But, regardless of what is meant by "prospective" and "retroactive" in the context of applying a judicial decision to events occurring before the decision, it is clear that, when a decision governs only operative events occurring after the date of the decision, the decision is being applied prospectively only.

For purposes of a decision invalidating a tax statute, the operative event is not the formulation of a plan to spend future tax dollars; rather it is the actual imposition of tax liability. *See, e.g., Southern Pacific Co. v. Cochise County,* 92 Ariz. 395, 406–407, 377 P.2d 770, 778–779 (1963); *Deltona Corporation v. Bailey,* 336 So.2d 1163, 1165–1167 (Fla.1976); *Perkins v. County of Albemarle,* 214 Va. 416, 200 S.E.2d 566 (1973); *National Can Corp. v. Dept. of*

---

7. To be distinguished from the cases involving a new interpretation of a constitutional provision, statute, or rule, are those in which this Court, in the exercise of its authority under Article 5 of the Maryland Declaration of Rights, issues a ruling that changes the common law of Maryland. Ordinarily, except as to the parties before the court, such decisions are fully prospective. *See, e.g., Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 162, 497 A.2d 1143, 1162 (1985); *Boblitz v. Boblitz,* 296 Md. 242, 275, 462 A.2d 506, 522 (1983); *Williams v. State,* 292 Md. 201, 217–220, 438 A.2d 1301, 1308–1310 (1981); *Lewis v. State,* 285 Md. 705, 714–716, 404 A.2d 1073, 1078–1079 (1979). *See also Pope v. State,* 284 Md. 309, 352, 396 A.2d 1054, 1078–1079 (1979). *Compare Deems v. Western Md. Ry.,* 247 Md. 95, 115, 231 A.2d 514, 525 (1967).

*Revenue,* 109 Wash.2d 878, 749 P.2d 1286, 1287 (1988); *Ashland Oil, Inc. v. Rose,* 350 S.E.2d 531, 536–537 (W.Va. 1986), *appeal dismissed,* 481 U.S. ——, 107 S.Ct. 1949, 95 L.Ed.2d 522 (1987).

■ Therefore, in determining whether A.T.A. in fact seeks retrospective application of *Scheiner,* it is irrelevant that state officials prepared the fiscal 1988 budget with the expectation that the State would receive future revenues under § 423(a). Instead, the relevant factor is that the tax liability imposed on the plaintiffs generally did not arise until approximately January 1, 1988, more than six months after the *Scheiner* decision. Consequently, in requesting an injunction against such future enforcement of the marker fee statute, the plaintiffs clearly did not seek retrospective relief in any recognized sense of that term.

Nonetheless, the defendants rely on *Lemon v. Kurtzman,* 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) (*Lemon II*). In that case, the Supreme Court decided not to apply retrospectively a prior decision in which it had invalidated a state statute authorizing reimbursements to private sectarian schools which provided secular educational services. *See Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (*Lemon I*). As a result of *Lemon II,* the state could reimburse the schools for secular services rendered before the date of the decision in *Lemon I,* even if the reimbursements were not actually made until after the date of that decision. Invoking *Lemon II,* the defendants in the case at bar argue (brief p. 30 n. 28):

> "Just as the schools in *Lemon I* performed services, with the expectation of payment, ... the State and its political subdivisions planned their budgets and programs, with the expectation that revenues would be received from Article 81, § 423(a), prior to the Supreme Court's decision in *Scheiner.* As the district court in *Lemon II* ordered that the schools receive their compensation for those services rendered before the Supreme Court struck down the statute in *Lemon I,* the circuit court below similarly ordered that the State be permitted to collect the tax

revenues previously anticipated before *Scheiner* was decided."

The defendants' emphasis on "expected" or "anticipated" payments is misplaced. In *Lemon II*, the expected payments were for obligations arising before *Lemon I*, based on services performed before *Lemon I*. In the instant case, however, the obligation to pay arose after the *Scheiner* decision. Mere "expectations" alone cannot be the decisive factor as to whether a judicial decision operates retrospectively. Otherwise, a state could continue to collect a tax for years after it had been declared unconstitutional if the state had previously planned on receiving revenues from that tax over the course of several subsequent years.[8]

The Supreme Court in *Lemon II* simply chose not to apply its prior decision to destroy obligations—the schools' claims for reimbursement—that had accrued before the date of that decision. By contrast, a bar to the enforcement of § 423(a) after the date of *Scheiner* obviously does not threaten to destroy any tax obligations that accrued before the date of *Scheiner*. To reiterate, the obligation in this case did not occur until after the date of *Scheiner*. Consequently, *Lemon II* provides no support for the defendants'

---

**8.** It is true that, in denying refunds for taxes previously paid under an invalid statute, some courts have reasoned that the authorities were entitled to rely on prior law when they collected the tax and expended the revenues collected thereunder. *See, e.g., Gulesian v. Dade County School Board,* 281 So.2d 325, 326 (Fla.1973); *Pellnat v. City of Buffalo,* 59 A.D.2d 1038, 1039, 399 N.Y.S.2d 788, 790 (1977); *Hurd v. City of Buffalo,* 41 A.D.2d 402, 405–406, 343 N.Y.S.2d 950, 953–954 (1973), *aff'd,* 34 N.Y.2d 628, 311 N.E.2d 504, 355 N.Y.S.2d 369 (1974) (per curiam); *Forward v. Webster Central School Dist.,* 133 Misc.2d 480, 486–487, 506 N.Y.S.2d 528, 532–533 (1986); *Metropolitan Life v. Comm'r of Dept. of Ins.,* 373 N.W.2d 399, 410–412 (N.D.1985); *Rio Algom Corp. v. San Juan County,* 681 P.2d 184, 196 (Utah 1984); *National Can Corp. v. Dept. of Revenue,* 109 Wash.2d 878, 749 P.2d 1286, 1293 (1988); *Ashland Oil Co. v. Rose,* 350 S.E.2d 531, 535 (W.Va.1986), *appeal dismissed,* 481 U.S. ——, 107 S.Ct. 1949, 95 L.Ed.2d 522 (1987). *See also Southern Pacific Co. v. Cochise County,* 92 Ariz. 395, 406, 377 P.2d 770, 778 (1963). These decisions, however, are entirely inapposite in this case because A.T.A. seeks only an injunction against future enforcement of § 423(a) and has abandoned any refund claim for taxes paid before the date of *Scheiner*.

position.[9] Rather, the defendants' reliance on that case would have been justified only if the Supreme Court had permitted the state to continue to reimburse private, sectarian schools for services provided *after* the date of *Lemon I.*

Similarly, the defendants' reliance upon *Ashland Oil Co. v. Rose, supra,* 350 S.E.2d 531, is misplaced. While the West Virginia court in that case did order the payment of taxes after the United States Supreme Court had declared the relevant statute to be unconstitutional, the taxes at issue had been assessed before the Supreme Court's decision. Thus, as in *Lemon II,* the *Ashland Oil* court simply ruled that the statute's invalidity should not relate back to destroy obligations that arose before the Supreme Court had acted. As we have pointed out, however, A.T.A. does not now seek to avoid any obligation that predates *Scheiner.*

## IV.

Having failed to show that A.T.A. seeks retrospective relief, the defendants also argue that a number of courts have delayed the effective date of a decision when administrative difficulties or fiscal hardship would follow from giving the ruling immediate prospective effect. *See, e.g., Northern Pipeline Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 88, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982); *Buckley v. Valeo,* 424 U.S. 1, 143, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976); *Brown v. Board of Educ.,* 349 U.S. 294, 300–301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (*Brown II*). *See also Salorio v. Glaser,* 93 N.J. 447, 467–468, 461 A.2d 1100, 1111, *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *Hellerstein v. Assessor of Town of*

---

**9.** In fact, the very language of *Lemon II* refutes the defendants' argument. Writing for a plurality of the Court, Chief Justice Burger stated (411 U.S. at 199, 93 S.Ct. at 1469, 36 L.Ed.2d 151): "[T]he problem of the instant case is essentially one . . . arising from enforcement of a state statute during the period before it had been declared unconstitutional." As pointed out above, however, planning to impose a tax is not the same as "enforcing" the tax obligation itself.

*Islip*, 37 N.Y.2d 1, 14, 332 N.E.2d 279, 287, 371 N.Y.S.2d 388, 399 (1975), *modified*, 39 N.Y.2d 920, 352 N.E.2d 593, 386 N.Y.S.2d 406 (1976); *Soo Line R. Co. v. State*, 286 N.W.2d 459, 468 (N.D.1979); *Bond v. Burrows*, 103 Wash. 2d 153, 164, 690 P.2d 1168, 1174 (1984).

■ In our view, however, such relief should be available only in the most extraordinary cases. This is evident from the fact that, in over 200 years that this Court has exercised jurisdiction under Maryland's Constitutions, we have never postponed, in the manner requested by the defendants, the prospective effect of a decision invalidating a statute.

The Supreme Court's cases also illustrate that, except in exceedingly rare and unusual circumstances, a court should not grant the relief sought by the defendants in the instant case. For example, in *Brown II, supra,* the Court devised the remedy to implement its landmark decision in *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), which held that racial segregation in public schools violated the Equal Protection Clause of the Fourteenth Amendment. The Court recognized in *Brown II* that, as a practical matter, the states could not immediately accomplish the enormously complex task of desegregating their public educational systems. Consequently, the Court ordered that the process of desegregation should proceed "with all deliberate speed," 349 U.S. at 301, 75 S.Ct. at 757. As Justice Roger J. Traynor observed (Traynor, *Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility,* 28 Hast.L.J. 533, 545 (1977)):

> "The extraordinary technique of the *Brown* decision, allowing an unspecified time for adjustment, was the only possible way of ensuring orderly transition from an old social order to a new. Millions of people were involved in the transition, and they could hardly be maneuvered at a moment's notice like small platoons of plaintiffs or defendants. There would be adjustments to make for those who had clamored for change as well as for those who had resisted it. Each group needed time to expand its familiar province and to learn to live in a wider world.

The judicial decision signaling the change was no simple decision weighing one individual's benefits or hardships against another's."

Decisions from state courts also show that a court should deny immediate implementation of a court decision only in the most unusual cases. For example, in *Hellerstein v. Assessor of Town of Islip, supra,* 37 N.Y.2d 1, 332 N.E.2d 279, 371 N.Y.S.2d 388, the Court of Appeals of New York held that, under New York law, all real property in that state had to be assessed at full value. Throughout the state, however, the widespread practice had been to make assessments at only a fraction of full value. Thus, the practical effect of the court's decision was to require the reassessment of virtually all real property in the state of New York. As a result, the court initially delayed the effective date of its decision for over 18 months, 37 N.Y.2d at 14, 332 N.E.2d at 287, 371 N.Y.S.2d at 399, and later granted an additional extension, *Hellerstein v. Assessor of Town of Islip,* 39 N.Y.2d 920, 352 N.E.2d 593, 386 N.Y.S.2d 406 (1976). *See also Soo Line R. Co. v. State, supra,* 286 N.W.2d 459.

No problems of implementation, comparable to those involved in *Brown II* or *Hellerstein,* exist in the present case.

The defendants chiefly rely on *Salorio v. Glaser, supra,* 93 N.J. at 462, 461 A.2d at 1108, which held that a commuter tax on out-of-state residents (the ETT) violated the Privileges and Immunities Clause of the United States Constitution, Art. IV, § 2, cl. 1. Although it issued its opinion on June 8, 1983, the court permitted the state to continue collecting the ETT until December 31, 1983. In reaching this decision, the court stated (93 N.J. at 467, 461 A.2d at 1111):

"We are persuaded to fix a prospective date because of our concern for the fiscal and administrative problems that would be engendered if the State were compelled to surrender ETT receipts before the end of the fiscal year. The State should be afforded a reasonable period of time to devise alternative revenue raising methods, abandon or

postpone transportation projects or consider some other suitable solutions."

■ We need not consider whether we would agree with the *Salorio* decision on similar facts. While in some rare and exceptional circumstances, like those in *Brown II* and *Hellerstein,* it may be appropriate to deny a litigant immediate prospective relief, the instant case is not a situation in which the circuit court should have done so. When measured against the consequences of the present case, it is apparent that a far greater amount of fiscal and administrative hardship has resulted from several of the prior decisions in which this Court invalidated revenue measures. Yet in none of those cases did this Court contemplate that its ruling should not take effect immediately. *See, e.g., Panitz v. Comptroller,* 247 Md. 501, 232 A.2d 891 (1967); *McKeldin v. Steedman,* 203 Md. 89, 98 A.2d 561 (1953). *See also Sears, Roebuck & Co. v. Tax. Comm.,* 214 Md. 550, 136 A.2d 567 (1957).[10]

For example, *Panitz v. Comptroller, supra,* concerned a purported supplementary appropriations bill which adopted a graduated income tax and authorized the expenditure of some $98,000,000 of the revenues thereby raised. This Court held that the bill violated the Budget Amendment of the Maryland Constitution, Art. III, § 52(8), because it was not " 'limited to some single work, object or purpose therein stated,' " 247 Md. at 509, 232 A.2d at 895. The Court did not postpone the effective date of its decision, although, in evident recognition of the hardship that the decision would cause, the Court held that a special session of the General

10. In fact, for over a century, this Court has repeatedly recognized that, in the case of an illegal tax, the proper remedy, and indeed the only remedy if the General Assembly has not enacted a remedial statute, is for the taxpayer to obtain an injunction against collection of the tax. *See Wash. Sub. San. Comm'n v. Mitchell & Best,* 303 Md. 544, 576–577, 495 A.2d 30, 46–47 (1985), and cases cited therein. Consequently, when a taxpayer seeks such an injunction, it would ordinarily seem most inappropriate for a court to delay the effective date of its ruling.

Assembly could appropriate the revenues.   247 Md. at 503,
232 A.2d at 892.

In the present case, if the circuit court had immediately
enjoined the enforcement of § 423(a), the defendants claim
that the State would have lost at most $12,000,000.[11]  Thus,
the impact of this case is far smaller than that of *Panitz.*
Moreover, if the impact of *Scheiner* were as great as the
impact of *Panitz,* the remedy of a special legislative session
would have been available.

Thus, in light of the foregoing, we hold that the circuit
court erred in refusing to enter an immediate injunction
against further enforcement of § 423(a).[12]

---

**11.**  Although the amount of lost revenues is undisputed, the defend-
ants' claims of resulting hardship appear overstated.  Taxes collected
under § 423(a) are statutorily dedicated to the Maryland Transporta-
tion Trust Fund, the assets of which are used to finance highway
construction and maintenance projects, as well as other transporta-
tion projects.  *Goldstein I, supra,* 301 Md. at 376, 483 A.2d at 49–50.
*See* Code (1977, 1987 Cum.Supp.), § 3–216 of the Transportation
Article;  Code (1957, 1980 Repl. Vol., 1987 Cum.Supp.), Art. 81,
§ 412A.  In the trial court, a state official conceded that the State
expected the Transportation Trust Fund to receive $10,000,000 to
$12,000,000 in unforeseen revenues from titling taxes.  Obviously, this
sum would offset most if not all of the losses attributable to the
invalidation of § 423(a).  Moreover, since the date of the circuit
court's decision, it has become a matter of common knowledge that
increased fuel tax revenues are likely to produce a surplus of over
$100,000,000 in the Transportation Trust Fund.  *See The Sun,* Balti-
more, Dec. 19, 1987, at 12A.  The defendants do not contest the
accuracy of this figure.  In view of this large surplus, however, it is
difficult to conceive how the loss of marker taxes will threaten a
single highway project that the State, before *Scheiner,* had planned to
undertake.

**12.**  As mentioned earlier in this opinion, the plaintiffs also sought in
the circuit court a refund of the marker fees paid after the date of the
*Scheiner* decision.  Furthermore, as earlier noted, the defendants have
agreed that, if the circuit court erred in refusing to grant an immedi-
ate injunction against enforcement of § 423(a), the plaintiffs are
entitled to refunds of all marker fees paid after *Scheiner.*  In addition,
we note that the period of limitations for administrative refunds of
special taxes invalidly paid has not run.  *See* Code (1957, 1980 Repl.
Vol.), Art. 81, § 215.  Finally, at the oral argument before us, counsel
for the defendants expressly stated that, if the circuit court erred in

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-
MORE CITY AFFIRMED IN PART AND REVERSED IN
PART, AND CASE REMANDED TO THAT COURT FOR
FURTHER PROCEEDINGS NOT INCONSISTENT WITH
THIS OPINION. APPELLEES TO PAY COSTS.

---

refusing an immediate injunction against enforcement of § 423(a),
then "refunds will be paid."

Under these circumstances, we need not consider any of the possi-
ble legal issues concerning a claim for court-ordered refund of taxes
paid under an unconstitutional statute. *See,* in this connection, *e.g.,
Nordheimer v. Montgomery County,* 307 Md. 85, 97, 512 A.2d 379, 385
(1986); *Wash. Sub. San. Comm'n v. Mitchell & Best,* 303 Md. 544, 572,
495 A.2d 30, 44 (1985); *Vytar Associates v. City of Annapolis,* 301 Md.
558, 561–562, 483 A.2d 1263, 1265 (1984); *Potomac Elec. Power v. P.G.
County,* 298 Md. 185, 189, 468 A.2d 325, 327 (1983); *Apostol v. Anne
Arundel County,* 288 Md. 667, 421 A.2d 582 (1980); *White v. Prince
George's County,* 282 Md. 641, 651, 387 A.2d 260, 266 (1978), and cases
there cited. *See also, e.g., Carpenter v. Shaw,* 280 U.S. 363, 369, 50
S.Ct. 121, 123, 74 L.Ed. 478, 482–483 (1930); *Broadwell v. Board of
County Comm'rs of Carter County,* 253 U.S. 25, 40 S.Ct. 422, 64 L.Ed.
759 (1920); *Ward v. Love County,* 253 U.S. 17, 24, 40 S.Ct. 419, 422, 64
L.Ed. 751, 759 (1920); Tatarowicz, *Right to a Refund for Unconstitu-
tionally Discriminatory State Taxes and Other Controversial State Tax
Issues Under the Commerce Clause,* 41 Tax Law. 103, 121–123 (1987).