AMERICAN TRUCKING ASSOCIATIONS, INC., & others[1] *vs.*
SECRETARY OF ADMINISTRATION & others.[2]

Suffolk. February 4, 1993. - May 25, 1993.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Constitutional Law*, Commerce clause, Interstate commerce. *Motor Vehicle*, Interstate carrier. *Due Process of Law*, Taxation. *Practice, Civil*, Class action, Attorney's fees. *Damages*, Attorney's fees. *Attorney at Law*, Compensation.

Statement of the "internal consistency" test set forth by the United States Supreme Court in *American Trucking Ass'ns* v. *Scheiner*, 483 U.S. 266 (1987), requiring a State tax which applies to interstate business to be of a kind that "if applied by every jurisdiction, there would be no impermissible interference with free trade." [341-345]

This court held that certain flat annual fees imposed by the Commonwealth on interstate motor carriers, including two distinct annual fuel license fees, each assessed at $7, and a $200 annual fee required for each vehicle that transports hazardous waste in Massachusetts, failed the so-called internal consistency test and, as presently assessed, were in violation of the commerce clause of art. I, § 8, of the United States Constitution. [345-349]

The three-year statute of limitations applicable to claims for tax refunds governed an action on behalf of interstate motor carriers whose trucks were subject to certain flat annual fees imposed by the Commonwealth that were held to be violative of the commerce clause of the Federal Constitution; thus the relief afforded the plaintiffs was to be limited to fees paid during the three years immediately prior to the commencement of their action. [350-351]

In an action by interstate motor carriers arising out of their payment to the Commonwealth of certain fees held to be violative of the commerce

[1] Freymiller Trucking, Inc., and Ross Transportation Services, Inc. Both are trucking companies with no vehicles registered in Massachusetts, but which operate vehicles in Massachusetts subject to the challenged fees.

[2] Commissioner of the Department of Environmental Protection, Commissioner of Revenue, and Treasurer and Receiver General. The judge's report indicates that a stipulation of dismissal was entered as to the Commissioner of Public Safety.

clause of the Federal Constitution, this court, noting that a full refund of the fees would not necessarily be required, remanded the case for the judge to determine the plaintiffs' remedy based on a calculation of the discriminatory effect each of the fees had had on interstate carrriers during the contested period. [349-350, 351]

*Plaintiffs who were successful in claiming a denial of rights under the commerce clause of the Federal Constitution were entitled to recover reasonable attorney's fees from the Commonwealth pursuant to 42 U.S.C. § 1988 (1988) to be determined according to the "lodestar" approach; in the circumstances, the court rejected the attorneys' suggestion that, should the judge certify plaintiff classes on remand, the legal fees ultimately paid should be based on a percentage of the total amount of the plaintiffs' recovery.* [351-353]

CIVIL ACTION commenced in the Superior Court Department on October 21, 1991.

The case was reported to the Appeals Court by *Hiller B. Zobel,* J., on a statement of agreed facts. The Supreme Judicial Court granted a request for direct review.

*Robert Digges, Jr.,* of Virginia (*Jennifer L. Wieloch* with him) for the plaintiffs.

*Jon Laramore,* Assistant Attorney General, for the defendants.

GREANEY, J. We must decide whether certain flat annual fees imposed by Massachusetts on interstate motor carriers are measured and assessed in a manner which violates the commerce clause of art. I, § 8, of the United States Constitution. The plaintiff, American Trucking Associations, Inc., a national trade organization, along with two interstate trucking companies, brought this class action in the Superior Court on behalf of taxpayers whose trucks are "base-registered in jurisdictions other than Massachusetts" and who have been, are, or may become subject to any of the three challenged fees. The fees include two distinct annual fuel license fees, each assessed at $7, and a $200 annual fee required for each vehicle which transports hazardous waste in Massachusetts.

The plaintiffs contend that a United States Supreme Court decision, *American Trucking Ass'ns* v. *Scheiner,* 483 U.S.

266 (1987), requires that we invalidate the challenged fees because they are unrelated and unapportioned to a neutral factor such as the actual mileage a truck not registered in Massachusetts travels in this State and thus are measured and assessed in a manner which discriminates against interstate commerce. In connection with this claim, the plaintiffs sought: (a) certification of two classes of fee payers; (b) a declaration under G. L. c. 231A (1990 ed.), that each challenged fee violates the commerce clause; (c) an injunction barring further enforcement of the fees; (d) a refund of fees previously paid; and (e) reasonable costs and attorney's fees. Following the parties' submission of a statement of agreed facts and their stipulation that the statement included agreement as to all facts necessary for decision, a Superior Court judge reserved and reported the case to the Appeals Court, without decision, in accordance with Mass. R. Civ. P. 64, 365 Mass. 831 (1974), and G. L. c. 231, § 111 (1990 ed.).[3] We granted the plaintiffs' application for direct appellate review. Based on *Scheiner*, and our review of each of the challenged fees, we conclude that the fees are invalid under the commerce clause.

The pertinent facts are as follows. The Commonwealth requires that all motor carriers[4] operating their motor vehicles in Massachusetts, regardless of where the carrier or its vehi-

---

[3]Prior to any certification of the two asserted classes, the parties filed a joint motion requesting that the Superior Court judge report the case, without decision, to the Appeals Court. In granting this motion, the judge expressly deferred ruling on the plaintiffs' unopposed motion for certification as a class action until the dispositive issue in the case, the constitutionality of the challenged fees, was decided. Although matters of class certification and possible issues of damages and attorney's fees have been left open, it is obvious that the report raises important questions which we conclude should be decided without hypertechnical attention to the requirements of a proper report.

[4]"Motor carrier" is defined in G. L. c. 64F, § 1 (*e*) (1990 ed.), as "any person who regularly or habitually uses or operates motor vehicles upon the highways of this commonwealth which are propelled by fuel or special fuels purchased or acquired outside this commonwealth and is subject to the excise imposed by section three." The term "motor carrier" generally refers to a trucking company and the term "motor vehicle" generally refers to a truck. In addition to the per vehicle fuel license fees challenged in

cles are based or registered, must pay certain taxes and fees to support the State's highway system. For example, the Commonwealth imposes certain fuel consumption taxes on both gasoline and nongasoline fuels used in Massachusetts. See G. L. c. 64A, § 1; G. L. c. 64E, § 4; G. L. c. 64F, § 3 (1990 ed.).[5] In connection with the fuel consumption taxes, the Commonwealth requires that motor carriers register and license their vehicles on an annual basis and obtain fuel license decals which must be displayed on each vehicle. See G. L. c. 62C, § 67 (1990 ed.).

There are two separate fuel licenses identified in § 67, both of which are challenged in this case. The first, referred to as a "Motor Carrier Tax Vehicle License," is required for each vehicle operated in Massachusetts by a licensed motor carrier which uses any type of fuel purchased or acquired outside of Massachusetts.[6] The second, referred to as a "User of Special Fuels License,"[7] is required for each vehicle operated in Massachusetts which uses diesel or other nongasoline fuels. The annual fee for each of these fuel licenses is currently set at $7. 801 Code Mass. Regs. § 4.02 (830) (1), (3) (1989). Because most trucks use diesel fuel, both licenses are generally obtained for trucks operating in Massachusetts. In 1991, for example, both fuel licenses were obtained for 362,870 trucks at a cost of $14 per truck, while only 12,507 gasoline-powered trucks were licensed because of

this case, the Commonwealth requires that each motor carrier be licensed and pay an annual per company license fee. G. L. c. 62C, § 67 (1990 ed.). G. L. c. 64F, § 3 (1990 ed.).

[5]The plaintiffs do not challenge the fuel consumption taxes.

[6]We reject the plaintiffs' claim that this fuel license, which applies to both Massachusetts registered and foreign vehicles, facially discriminates against interstate commerce.

[7]A user of special fuels is defined by G. L. c. 64E, § 1 (*f*) (1990 ed.), as "any person, including a supplier or user-seller, who owns or leases any special fuels propelled motor vehicle operated over the highways of this commonwealth." The term "[s]pecial fuels" generally refers to any gas or liquid used to propel motor vehicles which is not a product commonly or commercially known as "gasoline." See G. L. c. 64F, § 1 (1990 ed.).

use of fuel purchased or acquired outside of Massachusetts. There were no diesel trucks which did not use fuel purchased or acquired outside of Massachusetts and thus licensed only for use of special fuels. Total fuel license fees collected in 1991 was $5,167,729. Revenue from fuel license fees is placed in the "Highway Fund," established by G. L. c. 90, § 34 (1990 ed.), and can be expended for such purposes as the "cost of construction, reconstruction, maintenance and repair of the public highways and bridges," as well as for the "cost of administration of laws providing for such revenue." Article 78 of the Massachusetts Constitution, as amended by art. 104 of the Articles of Amendment.

The third challenged fee relates to transportation of hazardous waste. All persons licensed to transport hazardous waste are required to purchase an annual vehicle identification device (sticker) for each vehicle used to transport hazardous waste in Massachusetts in accordance with G. L. c. 21C, § 7, fifth par. (1990 ed.). This sticker must be displayed on each truck (or other type of vehicle), regardless of where the truck is based or registered. The annual fee for the sticker, which is determined by the Department of Environmental Protection (department) in accordance with G. L. c. 21A, § 18 (*a*) (1990 ed.), is currently set at $200. In each year since 1988, the department has collected this fee for more than 2,500 vehicles, generating revenue greater than $500,000 a year. This revenue may be used "solely for the purposes of the administration and implementation of the permitting, compliance and enforcement, monitoring and analysis, and technical assistance programs of the department of environmental protection." G. L. c. 29, § 2P, inserted by St. 1990, c. 150, § 255.[8]

1. *Constitutionality of the challenged fees.* We begin our analysis with an examination of *American Trucking Ass'ns* v. *Scheiner*, 483 U.S. 266 (1987), the United States

---

[8]But see St. 1990, c. 150, § 347. Both § 255 and § 347 of St. 1990, c. 150, purport to insert after G. L. c. 29, § 20, a section designated § 2P.

Supreme Court decision which the plaintiffs contend principally controls this case. In *Scheiner*, the plaintiff truckers challenged as violative of the commerce clause two lump-sum annual "taxes"[9] imposed by the Commonwealth of Pennsylvania on each truck traveling on Pennsylvania's highways, whether registered there or not. Pennsylvania required that an identification marker be affixed to every truck over a specific weight, and imposed an annual flat fee of $25 for such marker, and it also imposed an annual axle tax, assessed at a rate of $36 per vehicle axle. The Supreme Court struck down both fees because the methods by which they were assessed had the effect of placing a greater economic burden on out-of-State trucks than on local trucks in violation of the commerce clause.[10] *Id.* at 296. Although payment of the fees afforded both out-of-State and local trucks the privilege of operating to an unlimited extent on Pennsylvania's highways, the Court viewed this privilege as "several times more valuable" to local trucks than to out-of-State trucks based on a showing that the average local truck traveled several times more miles per year on Pennsylvania's highways than did the average out-of-State truck. *Id.* In practical effect, the flat taxes imposed by Pennsylvania a cost per mile on interstate trucks that was significantly greater than that borne by local trucks, and, therefore, the taxes discriminated against interstate commerce. *Id.* at 286.

---

[9]It is of no relevance what label is attached to the assessment imposed by a State if it actually discriminates against interstate commerce. Thus assessments which have been styled as fees or other charges have been struck down if they are determined to have an impermissible effect on free trade.

[10]"No State, consistent with the Commerce Clause, may 'impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business.' [*Northwestern States Portland Cement Co.* v. *Minnesota*, 358 U.S. 450, 458 (1959)]. . . . Permitting the individual States to enact laws that favor local enterprises at the expense of out-of-state businesses 'would invite a multiplication of preferential trade areas destructive' of the free trade which the Clause protects. *Dean Milk Co.* v. *Madison*, 340 U.S. 349, 356 (1951)." *Boston Stock Exch.* v. *State Tax Comm'n*, 429 U.S. 318, 329 (1977).

The Court concluded, *id.* at 284-286, that the Pennsylvania flat taxes failed the "internal consistency" test set forth in *Armco Inc.* v. *Hardesty*, 467 U.S. 638, 644 (1984). *Scheiner, supra* at 284-286.[11] That test requires that a State tax which applies to interstate business be of a kind that, "if applied by every jurisdiction, there would be no impermissible interference with free trade." *Id.* The Pennsylvania taxes favored local truckers because the *amount* charged did not "vary directly with miles traveled or with some other proxy for value obtained from the State." *Scheiner, supra* at 291. If similar flat taxes were imposed by other States, there would be impermissible multiple taxation on interstate trucking not faced by local truckers.[12] To be internally consistent, therefore, a flat tax imposed by a State on interstate trucking would have to be "fairly apportioned," that is keyed to the interstate truckers' actual use of State highways, facilities, or

---

[11]The test was developed in *Container Corp. of Am.* v. *Franchise Tax Bd.*, 463 U.S. 159, 169 (1983) ("The first, and . . . obvious, component of fairness in an apportionment formula is what might be called internal consistency — that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business income being taxed"). The test was also applied in *Tyler Pipe Indus.* v. *Washington Dep't of Revenue*, 483 U.S. 232 (1987), to invalidate a Washington tax on gross receipts from various business activities carried on in the State.

[12]If each State assessed flat annual taxes similar to those charged by Pennsylvania, either as an original revenue producing measure or in retaliation for Pennsylvania's action, a truck traveling solely within one State would pay one marker fee, while it is conceivable that a truck traveling just one time in the forty-seven other contiguous States and the District of Columbia, but traveling the same annual total number of miles as the intrastate truck, would pay forty-nine marker fees merely because the truck participated in interstate commerce.

Although it appears that the discriminatory impact of a tax which fails the internal consistency test would only be realized when numerous jurisdictions imposed similar taxes, the Court clearly stated that the actual imposition of similar taxes is not a necessary factor to consider when applying the internal consistency test to a challenged tax. *American Trucking Ass'ns* v. *Scheiner*, 483 U.S. 266, 285 (1987). A tax which fails the internal consistency test may eventually cause other jurisdictions to adopt retaliatory levies which "would occasion manifold threats to the national free trade area." *Id.*

services.[13] By way of contrast, the Court pointed out that Pennsylvania's fuel consumption taxes were proper because they were "directly apportioned to the mileage traveled [by all truckers] in Pennsylvania; they are therefore simply payments for traveling a certain distance that happens to be within Pennsylvania." *Id.* at 283. (Massachusetts' fuel consumption taxes are also directly apportioned.) Similarly, the Court noted that the vehicle registration fee required by Pennsylvania, and every other State, is an assessment which satisfies the internal consistency test because each State grants reciprocity for registration fees paid to other States and thus "[p]ayment of one registration fee enables a carrier to operate a vehicle either locally or in the interstate market." *Id.*

A commentator on the subject of the limitation imposed by the commerce clause on State taxation in the area of interstate trucking has summarized the substance of the *Scheiner* case as follows:

> "But Pennsylvania's flat taxes for the use of its roads failed the 'internal consistency' test. Payment of the flat taxes to Pennsylvania, unlike payment of registration fees, provided no immunity from payment of similar taxes imposed by other states. Nor were flat taxes, unlike motor fuel taxes, apportioned to some neutral factor like extent of road use, which made state lines irrelevant. While registration fees and motor fuel taxes could thus be replicated by every state without putting the interstate carrier at a competitive disadvantage, the same could not be said of unapportioned flat taxes. 'If each State imposed flat taxes for the privilege of making commercial entrances into its territory, there is no con-

---

[13]On the fair apportionment issue, the Court also held that a State assessing a flat tax must demonstrate that the tax is "the only practicable means of collecting revenues from users and the use of a more finely graded user-fee schedule would pose genuine administrative burdens." *Id.* at 296. This burden requires the State to show that more accurate apportionment of the cost of benefits provided is "impracticable." *Id.* at 297.

ceivable doubt that commerce among the States would be deterred.' "

Hellerstein, Is "Internal Consistency" Foolish?: Reflections on an Emerging Commerce Clause Restraint on State Taxation, 87 Mich. L. Rev. 138, 147 (1988). It is not surprising, therefore, that jurisdictions which have considered flat annual motor vehicle taxes since *Scheiner* have struck them down as unconstitutional under the principles stated in *Scheiner*. These cases include the assessment of fees arguably similar to those in issue here. See, e.g., *Government Suppliers Consolidating Servs., Inc.* v. *Bayh*, 975 F.2d 1267, 1281 (7th Cir. 1992), cert. denied, 113 S. Ct. 977 (1993) ($100 biannual fee imposed by Indiana for identification stickers indicating registration to transport municipal waste); *Commonwealth* v. *American Trucking Ass'ns*, 746 S.W.2d 65, 67 (Ky. 1988) (annual "Supplemental Highway Users" tax); *Black Beauty Trucking, Inc.* v. *Indiana Dep't of State Revenue*, 527 N.E.2d 1163, 1165 (Ind. Tax Ct. 1988) ($50-per-truck "Supplemental Highway User" fee); *American Trucking Ass'ns* v. *Secretary of State*, 595 A.2d 1014, 1017 (Me. 1991) (annual $25-per-truck hazardous material transportation license); *American Trucking Ass'ns* v. *Goldstein*, 312 Md. 583, 589-590 (1988) (annual $25-per-vehicle marker fee indicating registration for fuel tax reporting purposes); *American Trucking Ass'ns* v. *Conway*, 152 Vt. 383, 386 (1989) ($50 fuel-user license fee).

The three Massachusetts annual flat fees appear to violate the internal consistency test because the imposition of the full measure of each fee is triggered by an interstate truck simply crossing the border of Massachusetts and making just one commercial entry into the State. If each State imposed flat fees of these types for passing through its jurisdiction, an impermissible interference with free commerce would result. The three fees also appear unfairly apportioned because they are unapportioned and unrelated to actual use of Massachusetts highways. Although the discriminatory impact of the fees is not precisely quantifiable because the stipulated facts

do· not include statistics regarding the average number of miles traveled annually in Massachusetts by local trucks and by those registered in other jurisdictions, it is intuitively obvious that local trucks derive far greater economic benefit from each of the challenged fees paid than do interstate trucks. See *Trailer Marine Transp. Corp.* v. *Rivera Vazquez*, 977 F.2d 1, 10 (1st Cir. 1992). The Commonwealth concedes, in fact, that some interstate motor carriers, to ensure that some or all of the trucks in their fleet will have the flexibility to travel to Massachusetts on short notice, pay fuel license fees for some trucks even though the trucks do not enter Massachusetts during the year they are licensed.

The Commonwealth maintains that the three fees are fairly apportioned. We examine the Commonwealth's contentions on the point under the requirement in *Scheiner* that the method of apportioning the cost of the fees not only must be fair, but the fairest means practical of determining the benefit received by each user. See note 13, *supra*.

The Commonwealth maintains that it incurs costs of over $1,000,000 each year in issuing fuel licenses and administering the fuel consumption tax system. The Commonwealth further asserts that it incurs certain direct costs for each fuel license issued and each fuel consumption tax return processed, regardless of whether the licensed vehicle travels in Massachusetts, so that the total costs incurred by the Commonwealth increase with each vehicle license issued. Thus, the Commonwealth argues, these costs should not be apportioned according to miles traveled, or some other neutral standard, because they are currently assessed in a manner which fairly approximates the use which truckers made of the Commonwealth's fuel tax system.

If, indeed, the agreed facts indicated that the Commonwealth incurs total direct costs of approximately $7 for issuing each fuel license and processing each fuel consumption tax return, then it might be possible to conclude that the fuel license fees are fairly apportioned. The Commonwealth, however, collects more than $5,000,000 annually from fuel license fees. More than one-half of the funds collected are

available for general highway construction and maintenance. It is therefore apparent that the fuel license fees do not fairly reflect the actual costs incurred by the Commonwealth in issuing fuel licenses and administering the fuel consumption tax system and thus are not fairly apportioned.

The Commonwealth's argument with regard to the hazardous waste transporter fee is not based on direct costs incurred for each transporter. The Commonwealth concedes that the annual cost of maintaining its hazardous waste transporters' compliance program (which includes random inspection of vehicles, processing monthly reports, providing education and technical assistance, and enforcement) does not depend on the number of vehicles transporting hazardous waste. In fact, the $200 fee was determined by estimating the total annual cost of maintaining the compliance program and dividing that amount by the total number of vehicles expected to pay the fee. It could be superficially argued that the hazardous waste transporter fee is fairly apportioned.

If, however, the fee is viewed from the perspective of the user, as it must be, it is apparent that the fee does not vary based on any "proxy for value" obtained from the Commonwealth. An interstate hazardous waste transporter which travels just one time in the Commonwealth must pay the same fee as a local hazardous waste transporter. It is therefore apparent that the "privilege" of using the compliance program is more valuable to local transporters than to interstate transporters so that the practical effect of apportioning total costs on a per vehicle basis is to discriminate against interstate commerce. See note 12, *supra.*

The Commonwealth also contends that the fees are basically neutral user fees to which *Scheiner,* and the internal consistency test in particular, has no application. Specifically, the Commonwealth maintains that, like user fees which have sustained commerce clause challenges since *Scheiner,* the challenged fees should be analyzed according to the test set forth in *Evansville-Vanderburgh Airport Auth. Dist.* v. *Delta Airlines, Inc.,* 405 U.S. 707 (1972) (flat nominal service fee of $1 per passenger imposed by municipal airport to defray

costs of airport construction valid despite fact that vast majority of passengers traveled on interstate flights). Under this test, a user fee will be upheld "so long as [it] is based on some fair approximation of use or privilege . . . and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred." *Id.* at 716-717.

There is no merit to the Commonwealth's claim that the internal consistency test does not apply to user fees. *Scheiner* appears to supersede *Evansville-Vanderburgh*, and the decision essentially adds a layer of analysis which was not previously articulated in cases addressing user fees. See *American Trucking Ass'ns* v. *Secretary of State*, 595 A.2d 1014, 1016 (Me. 1991). See also *Exxon Corp.* v. *State Bd. of Equalization*, 783 P.2d 685, 696 (Wyo. 1989), cert. denied, 495 U.S. 910 (1990). A valid user fee will pass the internal consistency test because the full measure of the fee is not imposed for merely crossing the taxing State's border, but is directly related in purpose and amount, to the use of a service or privilege. For example, the user fee upheld in *Evansville-Vanderburgh*, and each of the user fees which have been upheld since *Scheiner*, are internally consistent because the taxing States' borders are essentially irrelevant to the measure of the tax imposed and the fees were not excessive in relation to the benefits received for their payment. See *Wallach* v. *Brezenoff*, 930 F.2d 1070, 1072 (3d Cir. 1991) (bridge toll imposed for each round trip crossing of interstate bridge); *Alamo Rent-A-Car, Inc.* v. *Sarasota-Manatee Airport Auth.*, 906 F.2d 516, 518-523 (11th Cir. 1990), cert. denied, 498 U.S. 1120 (1991) (airport maintenance fee of percentage of gross business receipts derived from airport customers of off-airport car rental companies). The fees here discriminate against out-of-State truckers by subjecting them to a higher charge per mile traveled in Massachusetts, and, as has been discussed, the fees do not fairly approximate the value of any benefit received here or a cost actually incurred here. We conclude that each of the challenged fees, as presently as-

sessed, fails the internal consistency test and is in violation of the commerce clause of the United States Constitution.

Although the challenged fees as they are currently assessed are invalid, there is no doubt that the Commonwealth may require that interstate carriers bear their fair share of the costs associated with highway use, including the costs related to issuing fuel licenses, administering the fuel consumption tax system, and maintaining the hazardous waste transporters' compliance assurance program. The Commonwealth currently has systems in place properly to apportion taxes imposed on both intrastate and interstate truckers. Fuel consumption taxes are apportioned based on miles traveled in Massachusetts and hazardous waste transportation taxes are apportioned based on pounds or gallons of waste transported in Massachusetts. See G. L. c. 64A, §§ 1, 7; G. L. c. 64E, §§ 4, 5; G. L. c. 21C, § 7, seventh par. It is therefore evident that apportionment of the relevant costs in accordance with the standards articulated in *Scheiner* would not be "impracticable," and that establishment of appropriate methods of collecting these costs would not impose an extraordinary administrative burden on the Commonwealth. Moreover, while we recognize that factors such as total miles traveled or total volume of hazardous waste transported do not necessarily relate to the total costs incurred by the Commonwealth, apportionment according to these factors appears to be the most practical means of allocating the approximate benefit received by each trucker.

2. *Remedy for unconstitutional tax.* The due process clause of the Fourteenth Amendment to the United States Constitution requires that, when a State has imposed a tax which is ultimately found unconstitutional, the State must "afford taxpayers a meaningful opportunity to secure postpayment relief for taxes already paid pursuant to [the unconstitutional] tax scheme." *McKesson Corp.* v. *Division of Alcoholic Beverages & Tobacco, Dep't of Business Regulation of Fla.*, 496 U.S. 18, 22 (1990). The form of relief which appears to be most common, and the remedy which has been requested in this case, is refund of the fees paid

during the contested tax period. In *McKesson Corp.*, however, the Court clarified that full refund of taxes paid is not necessarily required when a tax is deemed discriminatory under the commerce clause. *Id.* at 39-40 ("a State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this determination"). For example, a State may reformulate the tax and retain that portion of the previously paid tax which is *valid* under the commerce clause. *Id.* at 40. Any of a variety of methods of curing an unconstitutional tax is permissible "so long as the resultant tax actually assessed during the contested tax period reflects a scheme that does not discriminate against interstate commerce." *Id.* at 41.[14]

Before we address the appropriate remedy, we must consider the matter of the "contested tax period." Three years after deciding *Scheiner*, the Court found that *Scheiner* had established a new principle of law in the area of dormant commerce clause jurisprudence and held that *Scheiner* applies prospectively from the date of its announcement, June 23, 1987. *American Trucking Ass'ns* v. *Smith*, 496 U.S. 167, 180-183 (1990). Although the plaintiffs could have protested payment of the challenged fees in 1987, the plaintiffs did not bring this action until 1991. The commencement of the contested tax period should therefore be governed by the appropriate statute of limitations applicable to tax refunds. The plaintiffs propose that the three-year statute of limitations on actions against the Commonwealth set forth in G. L. c. 260,

---

[14]The Court specifically contemplated that States would ultimately refund less than the full measure of fees found unconstitutional under the principles announced in *Scheiner*. *American Trucking Ass'ns* v. *Smith*, 496 U.S. 167, 182-183 (1990) ("Presumably, under *McKesson [Corp.* v. *Division of Alcoholic Beverages & Tobacco, Dep't of Business Regulation of Fla.*, 496 U.S. 18 (1990)], the State would be required to calculate and refund that portion of the tax that would be found under *Scheiner* to discriminate against interstate commerce, with the attendant potentially significant administrative costs that would entail"). As previously noted, pursuant to *Scheiner*, many jurisdictions have invalidated flat fees similar to the fees found unconstitutional in this case. None of these jurisdictions, however, has addressed the matter of an appropriate remedy in light of *McKesson Corp.*, *supra*.

§ 3A (1990 ed.), should apply because the tax abatement statute, G. L. c. 62C, § 37 (1990 ed.), contemplates refund of taxes which require the filing of a tax return, and no other statute expressly authorizes refunds of the challenged fees. We agree that this action is governed by a three-year statute of limitations and, therefore, that the contested tax period relevant to this case commenced, as the plaintiffs assert, on November 15, 1988. Thus, once the appropriate remedy for curing the impermissible discrimination against interstate commerce is determined, this remedy will apply only to fees paid on or after November 15, 1988.

We turn to the issue of the appropriate remedy. As we have previously indicated, the stipulated facts do not provide sufficient information for us to quantify the actual economic discrimination caused by the fees found unconstitutional in this case. Absent such information, it is not possible for us to determine the remedy which will provide appropriate relief to the asserted plaintiff classes. Moreover, neither the plaintiffs nor the Commonwealth has had the opportunity to propose alternative remedies. The matter must be remanded to the Superior Court for calculation of the discriminatory effect each of the fees has had on interstate trucks during the contested tax period.[15] On remand, the parties are to be granted the opportunity to propose remedies consistent with *McKesson Corp., supra.*

3. *Attorney's fees.* The plaintiffs and their attorneys raise two distinct issues with regard to attorney's fees. The first issue concerns whether the *plaintiffs* are entitled to recover reasonable attorney's fees from the Commonwealth as the prevailing party under the Federal fee-shifting statute, 42

---

[15]There is little doubt that the fees in this case, which were established long before *Scheiner* was decided, would have passed muster under pre-*Scheiner* commerce clause jurisprudence. In establishing these fees, the Legislature clearly intended that interstate truckers pay only their fair share of the costs incurred by the Commonwealth. Accordingly, the statutes relating to these fees, as they currently stand, provide sufficient authority for the recalculation of the fees in a manner consistent with the requirements of *Scheiner* and *McKesson Corp.*

U.S.C. § 1988 (1988). The second issue concerns the amount of fees plaintiffs' *attorneys* are entitled to recover and the manner in which these fees will be paid if this action is certified as a class action.

The first issue raised is easily resolved. The United States Supreme Court has recently held that plaintiffs who have been successful in claiming a denial of rights under the commerce clause are entitled to attorney's fees pursuant to 42 U.S.C. § 1988. *Dennis* v. *Higgins*, 498 U.S. 439, 451 (1991). Since the plaintiffs have prevailed in this action, they may recover reasonable attorney's fees from the Commonwealth to be determined by the Superior Court judge according to the "lodestar" approach, defined as "the product of reasonable hours times a reasonable rate." *Pennsylvania* v. *Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986). See *Burlington* v. *Dague*, 112 S. Ct. 2638, 2643 (1992); *Fontaine* v. *Ebtec Corp.*, *ante* 324-327 (1993).

In this case, which is asserted to be a class action, the plaintiffs' attorneys claim that the classes sought to be certified are entitled to recover fees based on the lodestar approach, but suggest that they are entitled to recover their fees based on a reasonable *percentage* of the total award (including refund of the challenged fees and the § 1988 attorney's fee award) recovered by the plaintiff classes and placed in a common fund in the court. See *Coggins* v. *New England Patriots Football Club, Inc.*, 406 Mass. 666, 669 (1990).[16] In essence, the plaintiffs' attorneys imply that they should recover their fees based on a contingency factor (the total

---

[16]Although it appears at first glance that the plaintiffs' attorneys should be entitled to recover the same amount that the plaintiffs receive as their attorney's fee award, the issue is not so straightforward. As noted above, under § 1988, a successful plaintiff, and not the attorney, is entitled to recover attorney's fees. The amount that a plaintiff ultimately pays to the attorney is not necessarily the same as the fee recovered under § 1988, because the plaintiff may have agreed to compensate the attorney on a basis other than that used to determine the lodestar amount. See *Venegas* v. *Mitchell*, 495 U.S. 82, 90 (1990) (although plaintiff awarded a lodestar sum as reasonable attorney's fees under 42 U.S.C. § 1988, plaintiff must pay attorney much greater amount pursuant to contingent-fee contract).

amount recovered by the plaintiffs) and not based on the same lodestar method used to determine the plaintiffs' statutory award of fees.

As previously discussed, this action has not yet been certified as a class action by the Superior Court judge. See note 3, *supra.* If, on remand, the asserted classes are certified, we agree that any recovery received by the plaintiff classes should be placed in a common fund (or funds) in the court and that payment of attorney's fees should be made from this common fund. We reject, however, the suggestion that the plaintiffs' attorneys in this case should be compensated based on a percentage of the total amount recovered by the plaintiffs. In this case, we believe that the lodestar method is the appropriate one to determine reasonable attorney's fees under § 1988, and is to be used to determine the amount of fees ultimately paid to the plaintiffs' attorneys from the common fund. See *Skelton* v. *General Motors Corp.*, 860 F.2d 250, 253 (7th Cir. 1988), cert. denied, 493 U.S. 810 (1989).

4. *Conclusion.* A declaration that the three challenged fees are unconstitutional under the commerce clause of the United States Constitution is to be entered in the Superior Court. The Commonwealth is hereby enjoined from collecting the fees until a constitutionally permissible method of assessing them is determined. The action is remanded to the Superior Court for further proceedings consistent with this opinion, including, among others, the questions of damages and attorney's fees.

*So ordered.*