**AMERICAN BUS ASSOCIATION, INC., et al., Appellants,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 08–CV–808.**

District of Columbia Court of Appeals.

Argued Jan. 12, 2010.

Decided Aug. 19, 2010.

Richard P. Schweitzer, Washington, DC, and David R. Burton, with whom Craig M. Cibak and Dan R. Mastromarco were on the brief, for appellants.

Mary L. Wilson, Senior Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee.

Before REID, BLACKBURNE–RIGSBY and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

This case is a challenge by appellants American Bus Association, Inc., National Tour Association, Inc., and United Motorcoach Association, Inc. (the "Associations"), to the validity of a District of Columbia law that requires any charter bus that enters upon the roadways of this jurisdiction to (1) obtain District of Columbia registration, (2) register on an apportioned basis, reflecting mileage driven in the District of Columbia, or (3) obtain a trip permit, costing $50 and valid for a six-day period. Appellants contend that this scheme discriminates against and unduly burdens interstate commerce and therefore violates the so-called dormant Commerce Clause of the United States Constitution. They also argue that the scheme conflicts with the International Registration Plan (the "IRP"), an interstate compact to which the District of Columbia is a signatory. The Superior Court entered summary judgment in favor of appellee District of Columbia (the "District"). We affirm that ruling, agreeing with the Superior Court that appellants have failed to show either a Commerce Clause or an IRP violation.

## I. Background

The IRP is an agreement between the 48 contiguous states, the District of Columbia, and ten Canadian provinces.[1] To encourage "the fullest use of the highway system," the IRP authorizes apportioned registration of commercial vehicles and requires member jurisdictions to grant vehicle registration reciprocity to any vehicle registered in a vehicle's home ("base") ju-

---

1. *See* Int'l Registration Plan, Inc., *IRP History,* http://www.irponline.org/About/General Information/History (last visited July 15, 2010).

risdiction.[2] Apportioned registration allows commercial vehicle operators to pay a registration fee to a base jurisdiction, which then allocates and distributes portions of the fee to other jurisdictions in proportion to the miles driven by the vehicle in each jurisdiction.[3] The IRP describes in detail the registration and apportionment rules to which IRP members have agreed to adhere with respect to trucks and other apportionable vehicles. As to buses "used in the transportation of chartered parties," the IRP provides that "a bus ... may be registered under the Plan at the option of the Registrant." IRP art. II. ("Definitions") ("Apportionable Vehicle").

The District of Columbia became a member of the IRP in 1997 and in the same year adopted implementing legislation. *See* D.C.Code §§ 50–1507.01–1507.07 (2009). A few years later, the United States Department of Transportation issued a report, the "District of Columbia Tour Bus Management Initiative" (the "TBMI Report"), which recognized the importance of tour buses to the city's economy,[4] but also described problems related to tour bus operations.[5] The problems the TBMI Report described include air pollution, noise, traffic congestion, traffic safety risks, exacerbation of parking shortages, illegal parking, wear and tear on roadways, and the visual blight occasioned by "wall[s] of buses." *Id.* at 1. The report recommended that the District require permits for tour buses, which it described as "essential to the effective implementation of tour bus management measures" and as a "mechanism for funding measures [such as reasonably priced parking facilities, driver facilities, development of tour bus scheduling and information systems, and designation and enforcement of routing restrictions] that support bus operations and management." *Id.* at 41–43.

The TBMI report was followed in 2004 by a report of the District of Columbia Office of the Inspector General (the "OIG Report"), based on its audit of IRP participation by the Department of Motor Vehicles.[6] The OIG Report noted that "[t]our buses do not pay fees for use of the District's infrastructure" and that the District was "the only IRP jurisdiction of the 59 registered jurisdictions that does not charge a trip permit fee for non-apportioned vehicles" for "access and use of [the] jurisdiction's roads." *Id.* at i, 3, 6. The report recommended that the District establish and charge "an infrastructure

---

**2.** *See* International Registration Plan, Foreward & art. I, §§ 105, 125 (2010), *available at* http://www.irponline.org/irp/Document Display.aspx?id={ABAC96EE–BC41–4837–9 D22–63AF53072FA2}.

**3.** *See* Int'l Registration Plan, Inc., *IRP General Questions,* http://www.irponline.org/About/ GeneralInformation (last visited July 17, 2010); *see also Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.,* 455 F.3d 1107, 1109 (10th Cir.2006).

**4.** The report noted that tour buses "serve as many as one-third of the visitors to Washington's historical and cultural attractions" and "perform a function crucial to the economic life of the city and its role as the nation's capital." U.S. Dep't of Transp., Volpe Nat'l Transp. Sys. Ctr., *District of Columbia Tour Bus Management Initiative* 1 (2003), *available at* http://www.ncpc.gov/DocumentDepot/ Publications/DCTourBus_2003.pdf. The Report notes one estimate that "on a typical spring day, approximately 1,000 tour buses transport visitors to the District's sites." *Id.* at 80.

**5.** TBMI Report at 1.

**6.** *See* D.C. Office of the Inspector General, *Audit of the Department of Motor Vehicles' Participation in the International Registration Plan & the International Fuel Tax Agreement* 1–2, 4 (2004), *available at* http://oig.dc.gov/ news/PDF/release/OIG_04–2–07KV_a–FINA_ IRP_Report.pdf.

preservation fee for tour bus use of the District of Columbia's roadways and other physical facilities" to "facilitate and accommodate tour buses in the District," *id.* at ii, and to "pay for the maintenance and servicing of the District's infrastructure." *Id.* at 5.

In the wake of these reports, the Council of the District of Columbia enacted legislation providing that "[t]he fee for a trip permit shall be $50." [7] 52 D.C.Reg. 1708 (Feb. 25, 2005); D.C.Code § 50–1507.06(a) (2009).[8] Subsequently, the District of Columbia Department of Motor Vehicles adopted a regulation specifying that "[t]rip permits ... shall be valid for a six (6) day period." 18 DCMR 434.1 (2006); 53 D.C.Reg. 848 (Feb. 10, 2006). Thereafter, the Council passed the Department of Motor Vehicles Service and Safety Amendment Act of 2006 (D.C. Law 16–279). *See* 54 D.C.Reg. 921 (Feb. 2, 2007). Section 403(a)(3) of that legislation added D.C.Code § 50–1501.02(j), which specifically addresses charter buses. Section 403(a)(3) provides that:

(j) Notwithstanding any other provision of law, any bus from any state or country used in the transportation of a chartered party, as that term is used in the International Registration Plan, with a seating capacity of greater than 15 passengers shall, prior to entering the District of Columbia, either:

(1) Register as a Class B commercial vehicle under § 50–1501.03(b)(2);

(2) Obtain proportional registration in its base jurisdiction through the Inter-

national Registration Plan, as provided by § 50–1507.03; or

(3) Obtain a trip permit. . . .

D.C.Code § 50–1501.02(j) (2009 & 2009 Supp.).

Appellants are national trade associations whose members include non-District-based charter bus operators whose buses bring passengers into the District of Columbia and thus are subject to the requirements of section 50–1501.02(j). On July 27, 2007, the Associations filed a petition in the Tax Division of the D.C. Superior Court challenging the validity of section 50–1501.02(j). After the District took the position that the Tax Division did not have jurisdiction over the matter, the Associations voluntarily dismissed their Tax Division petition and filed a complaint in the Civil Division of the Superior Court on October 2, 2007. They sought a declaratory judgment to the effect that (1) as applied to charter buses registered in other jurisdictions, subsections 50–1501.02(j)(1) and (j)(3) violate the Commerce Clause; and (2) subsection 50–1501.02(j)(2) contravenes the IRP. The Associations also sought an order prohibiting the District from enforcing section 50–1501.02(j), a refund of all taxes paid under the statute by their member charter bus operators, attorneys' fees, and such other relief the court deemed appropriate.

On December 21, 2007, the Associations filed a motion for summary judgment and the District of Columbia filed a cross-motion to dismiss or, in the alternative, for summary judgment. In a bench ruling on May 16, 2008, the court granted the Dis-

---

**7.** A "trip permit" is "a temporary permit issued by a jurisdiction in lieu of regular [vehicle] registration reciprocity." D.C.Code § 50–1507.01(18) (2009).

**8.** *See also* D.C.Code § 50–1507.03(c) ("Vehicles qualifying for the IRP and engaged in interjurisdictional movement, but not apportioned or covered by reciprocity, shall acquire a trip permit prior to entering the District of Columbia").

trict's motion for summary judgment. This appeal followed.

## II.

Before turning to the merits of the trial court's summary judgment ruling, which we review *de novo*,[9] we must address issues of jurisdiction, which the District did not advance in the trial court, but has raised in this appellate proceeding.[10] The District's argument has two prongs. First, it argues that the Superior Court lacked jurisdiction to hear the Associations' complaint because the fees in question are actually taxes of a type described in D.C.Code § 47–3303 (2005), the validity of which the Superior Court may hear only in an action brought by the taxpayer(s) after payment of the disputed tax (and *not*, the District emphasizes, in an action by non-taxpayer membership associations). Second, the District argues that the Associations' action is barred by the District of Columbia Anti–Injunction Act, D.C.Code § 47–3307 (2005), which generally prohibits suits seeking declaratory or injunctive relief with respect to the assessment of taxes.[11] We address these arguments in turn.

### A.

D.C.Code § 47–3303 provides that "[a]ny person aggrieved by any assessment by the District of any personal property, inheritance, estate, business privilege, income and franchise, sales, alcoholic beverage, gross receipts, gross earnings, insurance premiums, or motor-vehicle fuel tax or taxes" may "within 6 months after the date of such assessment appeal from the assessment to the Superior Court of the District of Columbia; provided, that such person shall first pay such tax together with penalties and interest due thereon to the D.C. Treasurer." If the fees in issue are properly regarded as taxes (a matter we discuss *infra* ) and if section 47–3303 applies to them, the Associations' suit would be barred, because the Associations, not being "directly and personally affected" by the tax, are not "aggrieved" within the meaning of the section. *Hessey v. Burden,* 584 A.2d 1, 7 (D.C.1990) ("[A]ppeals from tax assessments can be brought only by 'persons aggrieved' in the sense of being directly and personally affected thereby." (quoting *Nat'l Bank of Washington,* 226 F.2d at 760 (holding that District

9. "In reviewing a trial court's grant of summary judgment, we perform an independent evaluation of the record." *George Washington Univ. v. Bier,* 946 A.2d 372, 375 (D.C. 2008); *see also Nat'l Ass'n of Postmasters of the U.S. v. Hyatt Regency Washington,* 894 A.2d 471, 474 (D.C.2006). Ordinarily, we "determine whether the party awarded summary judgment demonstrated that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Bier,* 946 A.2d at 375. In this case, however, appellants, the non-moving party for purposes of our review, have stipulated that there are no material facts in dispute. We view the record in the light most favorable to appellants as the non-moving party. *Id.; Nat'l Ass'n of Postmasters of the U.S.,* 894 A.2d at 474; *Swann v. Waldman,* 465 A.2d 844, 846 (D.C.1983).

10. As is well-established, except in unusual circumstances, jurisdictional issues may be

raised for the first time on appeal. *Nat'l Bank of Washington v. District of Columbia,* 226 F.2d 759, 760 (D.C.Cir.1953); *but see District of Columbia v. E. Trans–Waste of Md.,* 758 A.2d 1, 13–14 (D.C.2000) (suggesting that the District might be estopped from raising a jurisdictional issue for the first time on appeal where the complaints were filed originally in 1994 but the District did not raise a claimed jurisdictional bar until it lodged its appellate reply brief in 1999).

11. We have recognized that both section 47–3303 and section 47–3307 "deprive[ ] the Superior Court of jurisdiction over a taxpayer's appeal if the tax has not been paid." *Agbaraji v. Aldridge,* 836 A.2d 567, 569 (D.C.2003) (citing *First Interstate Credit Alliance, Inc. v. District of Columbia,* 604 A.2d 10, 11 (D.C. 1992)).

of Columbia Tax Court lacked jurisdiction over appeal from tax assessment because a " 'necessary party'—in form of person whose 'individual interests are directly and personally affected' by the assessment—was lacking," *Hessey,* 584 A.2d at 7.))). We are doubtful, however, that the fees in dispute here, even if they are taxes, fall within any of the categories listed in section 47–3303. The only category that arguably is applicable is the "business privilege" tax category, but the fees in question are unlike the income and gross-receipts taxes referred to in the D.C.Code and the case law of this jurisdiction as business privilege taxes.[12] *See, e.g.,* D.C.Code § 47–1810.02(b)(1) (2005) (establishing that a taxpayer subject to another jurisdiction's "franchise tax for the privilege of doing business" may be entitled to allocate and apportion its income for District of Columbia income tax purposes); *Lindner v. District of Columbia,* 32 A.2d 540, 544 (D.C. 1943) (characterizing the "business privilege tax" as "a gross receipts tax upon the privilege of engaging in business in the District") (citations and internal quotation marks omitted); *Neild v. District of Columbia,* 110 F.2d 246, 253 (D.C.Cir.1940) (noting that the tax upon the privilege of engaging in business in the District "makes the measure of the tax the gross receipts of the taxpayer").[13]

Some categories of taxes not specified in section 47–3303 are nonetheless subject to its terms because other provisions of law specifically state that assessments of those taxes may be challenged pursuant to section 47–3303. For example, D.C.Code § 50–2201.22 (2009) provides that "[a]ny person aggrieved by the assessment of any tax imposed by § 50–2201.03(j) [which establishes an "excise tax on the issuance of every original certificate of title for a motor vehicle or trailer in the District of Columbia"] may ... appeal to the Superior Court ... in the same manner and to the same extent as set forth in § ...47–3303." [14] However, the D.C.Code contains no similar provision with respect to other fees authorized by section 50–2201.03 (the Code section that establishes the Mayor's authority to make rules relating to the registration of vehicles). The implication is that challenges to vehicle registration fees (or fees in lieu of registration) are not subject to section 47–3303. And, indeed, the Council appears to have taken pains to avoid fashioning the trip permit and other options described in section 50–1501.22(j) as "business privilege" fees. Previous (unenforced [15]) legislation had included within the tax provisions of Title 47 of the D.C.Code a license tax ($150 per annum or $10 per day) "for the privilege of operating vehicles for hire having a seating capacity of more than 12 passengers." D.C.Code § 47–2829(c) (2005). By contrast, section 50–1501.22(j) is included

---

12. Also, as the Associations argue, charter buses presumably are subject to the fees described in section 50–1501.02(j) even if, for example, they enter the District of Columbia only to refuel or to seek repairs, rather than to avail themselves of the privilege of doing business here.

13. *Cf. Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 275, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) (analyzing Mississippi's "privilege taxes for the privilege of engaging or continuing in business or doing business within [the] state to be determined by the application of rates against gross proceeds of sales or gross income or values").

14. *See also, e.g.,* D.C.Code § 47–825.01(j–1) (2001) ("[A]n owner aggrieved by a proposed assessed value or classification [of real property] may appeal the proposed assessed value or classification to the Superior Court of the District of Columbia in the same manner and to the same extent as provided in §§ 47–3303 and 47–3304.").

15. *See* OIG Report at 4.

in Title 50 of the D.C.Code, the title pertaining to vehicle registration. For all these reasons, even assuming that the fees described in section 50–1501.22(j)(1)–(3) are taxes, we conclude that a challenge to payment of the fees need not have been brought under the terms of section 47–3303 (i.e., only by the aggrieved taxpayer after payment of the fees).[16]

### B.

The Anti–Injunction Act provides that "[n]o suit shall be filed to enjoin the assessment or collection by the District of Columbia or any of its officers, agents, or employees of any tax." D.C.Code § 47–3307 (2005). This prohibition "precludes declaratory as well as injunctive relief"— the very type of relief that appellants here sought through their Complaint. *District of Columbia v. Craig*, 930 A.2d 946, 953 (D.C.2007) (explaining that the Anti–Injunction Act requires that "the determination of the legality of a tax be determined in a refund suit") (citations, internal quotation marks, and alterations omitted). "Outside the context of a tax refund suit, a plaintiff seeking declaratory or injunctive relief from a tax assessment can avoid the Anti–Injunction Act bar only by showing that two criteria are met: that there is no adequate legal remedy, and that under no circumstances could the Government ultimately prevail." *Id.* (quoting *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962) (internal quotation marks omitted)).

To assess whether a fee is a "tax" within the meaning of the Anti–Injunction Act, this court has applied the three-part test described in *District of Columbia v. Eastern Trans–Waste of Maryland*, 758 A.2d 1 (D.C.2000). The test requires us to examine: "(1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge." *Id.* at 11 (citations and internal quotation marks omitted). Under the first prong of the test, if the legislature has imposed the charge, that weighs in favor of "tax" status, while a fee imposed by an administrative agency is more likely to be considered a fee. *Id.* Here, application of the first prong primarily (though not entirely) supports a conclusion that the fees in question are taxes. The Council passed the legislation, codified in section 50–1501.22(j), that requires charter buses to obtain either District of Columbia or apportioned registration or to obtain a trip permit(s). The Council also set the amounts of vehicle registration fees, according to vehicle weight, *see* D.C.Code § 50–1501.03(b) (2009), and set the trip permit fee at $50. *See* D.C.Code § 50–1507.06(a). On the other hand, it was the Department of Motor Vehicles that effectively set the per diem fee for trip permits, by providing through its regulation, 18 DCMR § 434.1, that each trip permit is good for a six-day period.

Under the second prong of the test, the fact that a charge is imposed on a narrow class of persons to be regulated weighs in favor of a conclusion that the fees in question are truly fees rather than taxes. *See E. Trans–Waste*, 758 A.2d at 11–12 (reasoning that the fact that the immediate population subject to the charge in issue was operators of open solid waste facilities weighed in favor of a finding that the charge was a fee). Section 50–1501.02(j), the provision in issue here, applies only to charter buses with a capacity

---

16. *But see Agbaraji*, 836 A.2d at 569 (reasoning that the tax in issue, a tax lien based on a property owner's failure to correct housing violations, was "treated as a general tax" and thus was "appropriately analyzed under Section 47–3303").

of fifteen or more passengers. This narrow scope of "what population is subject to the charge" suggests that the charges described in the section are fees. *E. Trans–Waste*, 758 A.2d at 11. On the other hand, subsections 50–1501.02(j)(1) and (2) describe commercial vehicle fees that are part of the overall scheme of vehicle registration set out in section 50–1501.03(b), fees that are broadly applicable and therefore may fit under the "tax" rubric. In addition, whichever conclusion is supported by application of the second prong of the test, it remains the case that "standing alone, the fact that an assessment targets only a narrow class of people is not enough to characterize the assessment as a fee." *E. Trans–Waste*, 758 A.2d at 12 (citation and internal quotation marks omitted).

■ "[F]or cases where the assessment falls near the middle of the spectrum between a regulatory fee and a classic tax, the predominant factor is the revenue's ultimate use.... If the ultimate use of the revenue benefits the general public then the charge will qualify as a 'tax,' while if the benefits are more narrowly circumscribed, the charge will more likely qualify as a 'fee.'" *Id.* at 12 (citations and internal quotation marks omitted). Here, too, application of the test does not yield a clear result. As the District argues, the TBMI and OIG reports that were the impetus for the legislation requiring charter buses to obtain trip permit fees or local or apportioned registration describe at length the objective of raising revenues not only to "support tour bus operations and management," TBMI Report at 42–43, but also to "pay for the maintenance and servicing of the District's [roadway] infrastructure." OIG Report at 5.[17] If the ultimate use of

the funds is infrastructure improvement, that is a use that benefits the general public, weighing toward a conclusion that the trip permit fee is a "tax." *Cf. Hager v. City of W. Peoria*, 84 F.3d 865, 872 n. 6 (7th Cir.1996) (explaining that a charge upon trucks was a tax "because the charge was used to help pay for highway construction, a 'general' type of public expenditure"). Moreover, D.C.Code § 50–1501.03(d) provides generally that "[t]he proceeds from fees payable under this chapter [Chapter 15—"Registration of Motor Vehicles"] shall be paid into the General Fund of the District of Columbia."

On the other hand, D.C.Code § 50–1507.06—subsection (a) of which establishes the $50 trip permit fee and subsection (b) of which pertains to "[v]ehicle registration fees for IRP registrants"—provides more specifically that:

(b)(1) Vehicle registration fees for IRP registrants, and all interest earned on those fees, shall be deposited into a designated account entitled the IRP Fund to be used to reimburse IRP member jurisdictions and after such reimbursement to offset the costs of implementing this subchapter.

(2) Any monies remaining in the IRP fund after the requirements of paragraph (1) of this subsection have been met may be used by the Department of Motor Vehicles to defray operating costs.

(3) All monies collected under this subsection and all interest earned on those monies shall be deposited into the IRP Fund without regard to fiscal year limitation, shall not revert to the fund balance of the General Fund at the end of any fiscal year or at any other time, but

---

17. *See District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 656 (D.C.2005) ("The 'benefits' of the [legislation] to the District of Columbia are reflected in the legislative findings that accompanied its passage").

shall be continually available for the uses and purposes set forth in this subsection, subject to authorization by Congress.

D.C.Code § 50–1507.06(b)(1)–(3). The foregoing language, indicating that fees not remitted to other IRP jurisdictions are to be used to defray the costs of IRP participation and Department of Motor Vehicles Operations, supports a conclusion that fees that the Department collects from "IRP registrants" (such as apportioned registration fees described in section 50–1501.02(j)(2)) are regulatory fees rather than taxes. Notably, section 525 of the IRP, entitled "Trip Permit Registration," authorizes member jurisdictions to issue trip permits on behalf of each other and requires the permit-issuing jurisdiction to forward the fees to the jurisdiction that requires the trip permit. Thus, it may be appropriate to consider charter buses that obtain trip permits pursuant to section 50–1501.02(j)(3) as "IRP registrants" and to treat the trip permit fees they pay as revenues described in section 50–1507.06(b)—i.e., as fees to be used to defray the costs of IRP participation and Department of Motor Vehicles Operations. Under that interpretation, the third prong of the "tax" or "regulatory fee" test may call for treating trip permit fees, too, as fees rather than taxes.

In short, application of the three-part "tax" or "regulatory fee" test leads to inconclusive and (as to the various components of section 50–1501.02(j)) possibly inconsistent results. As explained above, however, even if we conclude that any of the fees in issue is a tax, we would still need to consider whether an exception to the Anti–Injunction Act may apply, on the grounds that the Associations have no adequate legal remedy and that "under no circumstances could the Government ultimately prevail." *Craig,* 930 A.2d at 953. Consideration of the second of those factors necessitates analysis of the Associations' Commerce Clause and IRP claims. In light of all the foregoing, we have determined that the best approach is to proceed to the merits of the Associations' claims, without definitively resolving the issue of whether the fees in dispute are taxes. If, upon plenary review, we reject the Associations' claims, we will of course also be compelled to reject their argument that the District could "under no circumstances ... prevail." *Cf. Boy Scouts of Am. v. District of Columbia Comm'n on Human Rights,* 809 A.2d 1192, 1197 n. 4 (D.C.2002) ("[O]ur decisions enable us to pretermit [a jurisdictional] issue where alternative grounds clearly dictate the correct resolution of the appeal").[18]

### III. The Associations' Challenge under the "Dormant" Commerce Clause

■ The Supreme Court has long instructed that the Commerce Clause, which gives Congress the power to "regulate Commerce ... among the several States," U.S. Const. art. I, § 8, cl. 3, "contains a further, negative command, known as the dormant Commerce Clause ... [which] ... prevents a State from jeopardizing the welfare of the Nation as a whole by placing burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." *Am. Trucking Ass'ns v. Mich. Pub. Serv. Comm'n,* 545 U.S. 429, 433, 125 S.Ct. 2419, 162 L.Ed.2d 407 (2005) (citations, internal quotation marks, and alterations omitted); *see Beretta,* 872 A.2d at 656 ("[T]he Commerce

---

**18.** In light of the approach we take and our ultimate disposition, we need not reach appellants' argument that the District, reportedly having urged the Associations to proceed in the Civil Division rather than the Tax Division, is now estopped from arguing that the fees in question are taxes.

Clause has long been understood to have a 'negative' or dormant aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce.") (citation, internal quotation marks, and alteration omitted).[19]

Harmonizing the guidance set out in the Supreme Court's many dormant Commerce Clause opinions is not a simple task. Indeed, the Court has acknowledged the "uneven course of [its] decisions in this field," decisions that "reflect[ ] the difficulties of reconciling unrestricted access to the national market with each State's authority to collect its fair share of revenues from interstate commercial activity." *Am. Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 269, 280, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987) (describing the Court's dormant Commerce Clause decisions as a "quagmire of judicial responses to specific state tax measures"). The parties' briefs reflect the divergent and seemingly inconsistent decisions in this area. Focusing on the validity of $50 trip permits (the subsection (j)(3) option), the Associations emphasize the Court's reasoning in its 1987 opinion in *Scheiner*. In *Scheiner*, the Court invalidated a Pennsylvania axle tax and marker fee, deeming them to be unconstitutional "flat taxes" because they "imposed a much heavier charge per mile of highway usage by out-of-state vehicles" than they imposed on Pennsylvania-based vehicles, which "travel about five times as many miles on Pennsylvania roads as do the out-of-state vehicles." 483 U.S. at 276, 297, 107 S.Ct. 2829. The Associations assert that, similar to the problem with Pennsylvania's taxes, "[t]here is no direct correlation between the amount of the flat $50 trip permit fee and either the actual time spent or miles driven in the District" (complaining that the trip permit fees apply "whether the bus will operate in the District for six days or six hours").[20] The District, by contrast, draws an analogy between the (j)(3) trip permits and the flat annual fee that the Court upheld in its 2005 opinion in *American Trucking*, in which the Court rejected a dormant Commerce Clause challenge to the $100 fee that Michigan imposed on all

**19.** As the District's brief notes, case law applying the dormant Commerce Clause generally discusses the undue burdens that *states* may not impose on interstate commerce. The District, of course, is not a state, and Congress, which has the opportunity to disapprove any law passed by the Council before the law may become effective, *see* D.C.Code § 1–206.02(c)(1) (2006), may authorize a jurisdiction to impose burdens on interstate commerce. *See, e.g., Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 85, 113 S.Ct. 1095, 122 L.Ed.2d 421 (1993) ("It is well established that Congress may authorize States to engage in regulation that the Commerce Clause would otherwise forbid.") (citations and internal quotation marks omitted). Therefore, it may fairly be asked whether, as a matter of law, section 50–1501.02(j)—Council-passed legislation that Congress did not disapprove—could actually violate the dormant Commerce Clause. *But see Milton S. Kronheim & Co. v. District of Columbia*, 91 F.3d 193, 198 (D.C.Cir.1996) ("Our prece-

dents dictate that we apply to local legislation of the District the same interstate commerce analysis as we would to state laws."). This is another question that we need not resolve in light of our disposition of this matter.

**20.** The District argues that, while trip permit expenses may not correlate with mileage driven in the District, mileage may not be a good measure of charter buses' impact on roadways and the environment. As the TBMI Report notes, the District of Columbia has a "compact core with dense clustering of historic and cultural attractions," *id.* at 7, including many free-admission attractions that are in close proximity to each other, resulting in buses transporting tourists very short distances between many attractions. *Id.* at 81. The Report thus suggests that, even if they have relatively low in-District mileage, the buses may heavily impact the city through, *e.g.*, idling, parking, and creating traffic congestion.

trucks undertaking point-to-point hauls between Michigan cities. *Id.* at 438, 125 S.Ct. 2419. The Court did so notwithstanding the claim by interstate haulers, who incurred the $100 fee upon performing any intrastate hauling, that they "engage[d] in intrastate business less than trucks that confine[d] their operations" to Michigan. *Id.* at 431–32, 125 S.Ct. 2419.[21]

■ While the Court's decisions are not entirely easy to reconcile, and while none of them has considered a fee program analogous to the three-option program in issue here, we nevertheless can derive from them, and from appellate court rulings applying them, several abiding principles that guide our analysis here. We begin with the principle that "a state tax that favors in-state business over out-of-state business for no other reason than the location of its business is prohibited by the Commerce Clause." *Scheiner,* 483 U.S. at 286, 107 S.Ct. 2829; *see also Beretta,* 872 A.2d at 656 (explaining that State legislation that is for the purpose of economic protectionism, i.e., that "favor[s] in-state economic interests over out-of-state interests," may generally be struck down without further inquiry) (citations omitted). In this case, the record contains no suggestion that any such protectionist or discriminatory purpose underlies section 50–1501.02(j). Quite the contrary, the TBMI Report that was impetus for the legislation recognized that out-of-state charter buses, which bring into the District a large proportion of the tourists,

"perform a function crucial to the economic life of the city and its role as the nation's capital."[22] We cannot ascribe to the Council an intent to discourage or to disadvantage interstate commerce through the passage of section 50–1501.02(j).

Another guiding principle is embodied in the Supreme Court's observation in *Scheiner* that "[i]f each State imposed flat taxes for the privilege of making commercial entrances into its territory, there is no conceivable doubt that commerce among the States would be deterred." 483 U.S. at 284, 107 S.Ct. 2829. The Associations seize upon that statement to argue that section 50–1501.02(j) on its face violates the Commerce Clause because it makes "entering into the District of Columbia" (rather than activity within the District of Columbia) the basis for incurring fees. We reject this argument. The Supreme Court has "moved toward a standard of permissibility of state taxation based upon its actual effect rather than its legal terminology." *Scheiner,* 483 U.S. at 294–95, 107 S.Ct. 2829. Accordingly, our analysis must focus "not [on] the formal language of the . . . statute but rather [on] its practical effect." *Id.* at 295, 107 S.Ct. 2829. The relevant history—the TBMI and OIG Reports—makes clear that the focus of the fees that section 50–1501.02(j) now imposes on interstate charter buses (as well as local charter buses) is the impact on the infrastructure and environment of buses that use the District's roadways, park, idle, and create traffic congestion and hazards within city limits. The focus is not on the

21. The Court upheld the Michigan flat fee even though the record did not answer questions such as "Does the $100 charge make a difference by significantly discouraging interstate carriers . . .? Does the possibility of obtaining a 72–hour intrastate permit for $10 alleviate the alleged problem? . . . If the fees ($100 and $10) discourage [interstate carriers from performing intrastate hauling while in the State], does that local commercial effect make a significant interstate difference? Would a variable fee (of the kind the truckers advocate) eliminate such difference?" 545 U.S. at 435, 125 S.Ct. 2419.

22. TBMI Report at 1. The Associations assert that, during peak tourism season, 80% of the buses that carry tourists in the District of Columbia are out-of-state operators.

buses' crossing jurisdictional lines into the city. Moreover, subsection (j)(1) and (j)(2) registration fees are annual fees that apply without regard to how many times a bus enters the District of Columbia, and each subsection (j)(3) trip permit is valid for six days, during which period a charter bus might enter and exit the District of Columbia repeatedly.[23] Thus, notwithstanding the statutory language, the fees associated with each of these options are not actually taxes on "commercial entrances" into this jurisdiction. We are satisfied that, instead, they tax intra-District of Columbia activity (making them similar to Michigan's flat $100 fee on intrastate hauling that the Supreme Court upheld in *American Trucking* ).

The case law also requires us to consider whether the *effect* of the fee statute is to discriminate against charter buses that engage in interstate commerce or to tax interstate charter buses on their out-of-state operations (such that the fees are not "fairly apportioned" [24]). The Associations contend that these are precisely the effects of the options described in section 50–15010.2(j). They argue that the subsection (j)(1) District-registration option discriminates against interstate carriers because it

places burdens on charter operators domiciled outside the District of Columbia "far beyond what their District-based competitors face," since the "[o]ut-of-state operators would either pay two registration fees while DC operators would pay only one or be forced to move their business to the District of Columbia." The (j)(3) trip permit option discriminates against interstate carriers, they contend, because it is "not fully apportioned"—i.e., "[t]here is no direct correlation between the amount of the flat $50 trip permit fee and either the actual time spent or miles driven in the District." [25]

The Associations' argument rests in large part on the proposition that each option under section 50–1501.02(j) must be analyzed separately rather than by reference to the statutory scheme as a whole. We can agree that, if analyzed in isolation, subsection (j)(1) might not pass constitutional muster. In response to subsection (j)(1) as a sole option, charter bus operators that are based outside the District of Columbia might be forced to bear the expense and disruption of moving their operations to the District and modifying their businesses so that they become local operators.[26] Otherwise, with subsection (j)(1)

**23.** The TBMI Report notes that "[m]ost tour groups stay outside the District to take advantage of economy hotels." TBMI Report at 81. Thus, it appears that charter buses carrying such groups may make multiple trips into and out of the District during a single charter-excursion period.

**24.** *Complete Auto Transit,* 430 U.S. at 279, 97 S.Ct. 1076 (explaining that the Supreme Court has "sustained a tax against Commerce Clause challenge when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State"); *E. Trans–Waste,* 758 A.2d at 16–17 (recognizing applicability of the *Complete Auto Transit* test). " '[D]iscrimination' simply means differential treatment of in-state and

out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).

**25.** The Associations do not raise a dormant Commerce Clause challenge to the (j)(2) apportioned-registration option, but contend that the IRP precludes the District from requiring them to resort to apportioned registration (a claim that we address *infra* ).

**26.** *See* D.C.Code § 50–1501.02(c)(5)(A)(i) (providing that a vehicle may be registered in the District of Columbia if its owner either is domiciled here or if "(I) The owner is a partnership, corporation, association, or government entity; (II) The vehicle is housed in the

as the only option for out-of-state operators, such operators would have to pay full registration fees to the District as well as to their home jurisdictions (while, presumably, District-based operators would be subject to only one full registration fee). And if all other jurisdictions were to adopt a similar approach, interstate commerce might become prohibitively expensive. Stated differently, option (j)(1) as a sole option might violate the so-called "internal consistency test," *American Trucking*, 545 U.S. at 437, 125 S.Ct. 2419, because "[i]f each State imposed flat fees of these types for passing through its jurisdiction, an impermissible interference with free commerce would result." *Am. Trucking Ass'ns v. Secretary of Admin.*, 415 Mass. 337, 613 N.E.2d 95, 101 (1993). If, instead, the subsection (j)(3) trip permit fee were the only option for non-District-based charter operators, it could require charter bus operators that run regular excursions into the District of Columbia to pay more in fees than they would be required to pay

(and more than local operators are required to pay) under full District registration, disadvantaging them vis-à-vis locally-based operators.[27]

But the case law does not support the Associations' contention that we must analyze each of the types of fees described in section 50–1501.02(j) in isolation, disregarding the other options. The Supreme Court eschewed such an approach in *Scheiner*, reasoning instead that, in order to determine the constitutional validity of the "axle tax" and "marker fee" that Pennsylvania imposed on out-of-state carriers, it was necessary to take into account the "mechanics of . . . collection" of the state's other vehicle registration fees and mileage and fuel taxes, and how they applied to non-Pennsylvania-based trucks. *Scheiner*, 483 U.S. at 271, 107 S.Ct. 2829 (noting that these other fees and taxes "provide necessary background for our analysis of the economic significance and constitutional validity of the challenged flat taxes").[28] In

District of Columbia; (III) The vehicle is provided to an employee of the owner for the employee's use; (IV) The employee is domiciled in the District of Columbia; and (V) The owner submits an affidavit affirming compliance with this paragraph and agreeing that the address on the registration certificate and in the Department of Motor Vehicles' records shall be the address of the operator and that the employee's address shall be considered the owner's address for the purpose of sending any notices required by any statute or regulation for that vehicle.").

27. As described above, a $50 trip permit is good for six days. In the course of a year, a charter bus that operates in the District of Columbia every day of the year would need to obtain about 60 trip permits, at a cost of about $3,000. By comparison, what the Associations call a "typical" charter bus weighing 54,000 pounds would pay $1,675 annually to register in the District. Complaint, ¶ 12; *see* D.C.Code 50–1501.03(b)(2) (2009) (providing that passenger vehicles for hire weighing at least 10,000 pounds pay a registration fee of $575 plus $25 for each additional 1,000

pounds over 10,000 pounds). The fee paid to the District for apportioned registration would be some fraction of $1,675.

28. *See also Riverton Produce Co. v. State*, 871 P.2d 1213, 1222 (Colo.1994) ("Where application of a state tax is alleged to violate the Commerce Clause, it 'must be assessed in light of its actual effect considered in conjunction with other provisions of the State's tax scheme.' . . . Thus, the question before us is not whether application of [the challenged legislation] to interstate carriers but not intrastate carriers, by itself, would have violated the Commerce Clause, but rather whether the State's efforts as a *whole* to implement that statute in 1990 amounted to unconstitutional discrimination." (quoting *Maryland v. Louisiana*, 451 U.S. 725, 756, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981))); *Alaska v. Arctic Maid*, 366 U.S. 199, 204–05, 81 S.Ct. 929, 6 L.Ed.2d 227 (1961) (holding that 4% tax on foreigners who catch salmon in state waters and ship them south to be canned was permissible because domestic canneries were already subject to 6% tax); *Am. Trucking Ass'ns v. Quinn*,

addition, analyzing each of the section 50–1501.02(j) options in isolation makes no practical sense, because the Associations do not seriously claim that any of their members is somehow forced, or is likely, to choose the (j)(1) District-registration option over the less expensive (j)(2) apportioned-registration option, or to choose the (j)(3) trip permit option if it is more costly than a different option.[29]

 We think the better reading of the large body of dormant Commerce Clause jurisprudence is that where a fee statute provides the same options to out-of-state domiciliaries as to in-state domiciliaries and allows each to choose the option most economically practical for its own needs— thus regulating "evenhandedly"[30]—there is no basis for holding that it accords differential treatment to in-state and out-of-state operators and thus discriminates against interstate commerce in violation of the dormant Commerce Clause. *Cf. Lebanon Farms Disposal, Inc. v. County of Lebanon,* 538 F.3d 241, 245 n. 11 (3d Cir. 2008) (stating that, on remand, in assess-

437 A.2d 623, 626–27 (Me.1981) (noting that Maine had entered into a registration reciprocity agreement with other states, "whereby [trucks] with a Maine registration obtain the privilege of using the roads of all other signatory states, and vice versa," and reasoning that "[h]aving thus waived the right to impose registration fees ... on foreign-based trucks," the State's newly-enacted law requiring that operators of foreign-based trucks using Maine highways purchase an annual highway-use permit or trip permits, but exempting Maine-based trucks, amounted to a discriminatory tax on interstate commerce, that was not offset by any "complementary domestic taxes"); Jerome R. Hellerstein, *State Taxation* 147 & n. 237 (1983) (noting that in *Gregg Dyeing Co. v. Query,* 286 U.S. 472, 52 S.Ct. 631, 76 L.Ed. 1232 (1932), "the Court rejected the contention that discrimination must be determined within the 'four corners' of the taxing statute being challenged," and held instead that the Court must look to a state's broader tax scheme regarding in-state and out-of-state purchases; and explaining that "in determining whether discrimination has been practiced, the Court is not confined merely to the statute at issue that taxes the interstate business, but may consider other related statutes, since 'discrimination, like interstate commerce itself, is a practical conception,'" (quoting *Gregg Dyeing Co.,* 286 U.S. at 481, 52 S.Ct. 631)).

The Associations rely on the Supreme Court's statement in *Scheiner* that "[t]he flat taxes must stand or fall on their own." 483 U.S. at 289, 107 S.Ct. 2829. The context shows, however, that the Court meant by that statement that Pennsylvania could not justify the burden on interstate commerce of its non-

apportioned flat taxes by pointing to the fact that its domestic truck registration fees were higher than the registration fees charged by interstate operators' *home states. Id.* at 288, 107 S.Ct. 2829 ("[E]ven if the relative amounts of the States' registration fees confer a competitive advantage on trucks based in other States, the Commerce Clause does not permit compensatory measures for the disparities that result from each State's choice of tax levels."). The Court's statement does not imply that we may disregard facts about the mechanics of the District's charter bus fee program, such as the availability of fee options and whether an out-of-state operator pays any other fee for use of the District's infrastructure.

**29.** The Associations provide the example of the hardship that a New Jersey operator would face if required to house its buses in the District to qualify for District of Columbia registration (while running empty buses to New Jersey to pick up passengers), but does not suggest that this is an option that would be chosen over less expensive options.

**30.** *American Trucking,* 545 U.S. at 434, 437, 125 S.Ct. 2419. The Associations told the trial court that District-based charter operators do not actually have all three options described in section 50–1501.02(j), since they do not "get the [trip permit] option of paying every six days as you go." However, section 50–1501.02(j) states that "[n]otwithstanding any other provision of law," charter buses seating 15 or more passengers shall comply with one of the (j)(1)-(3) options—either District of Columbia registration, proportional registration, or obtaining a trip permit.

ing the burden on interstate commerce imposed by ordinance requiring waste haulers to haul to a specified in-county waste disposal facility, the district court "may want to make relevant findings of fact as to the ability of waste haulers to apply for and receive exceptions authorizing them to haul waste to [alternative] landfills," because such an option, "if it affords a realistic opportunity for success, reduces the burden on interstate commerce"); *Doran v. Mass. Tpk. Auth.*, 348 F.3d 315, 317, 319, 321 (1st Cir.2003) (rejecting Commerce Clause claim that Massachusetts Turnpike Authority (MTA) program that allowed drivers of vehicles equipped with a transponder sold by MTA to pass through certain toll plazas for a discounted toll discriminates against nonresidents of Massachusetts, because the right to purchase a transponder for $27.50 was "open to all," not just residents, even though the "decision whether to do so turns on one's anticipated frequency of use," and even though plaintiffs asserted that the purchase option was "a hollow option that few non-residents will choose"); *see also Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 4, 11–12 (1st Cir.2010) (reasoning that Massachusetts law whose effect was to allow in-state wineries to sell their wines through any combination of direct shipments to consumers, wholesaler distribution and retail distribution, but to restrict most out-of-state winery competitors to a single distribution method, was unconstitutionally discriminatory, because the law allowed in-state wineries to "choose which method or combination of methods will be most cost-effective," but left out-of-state competitors unable to distribute their wines through the most cost-effective method). The fact that the Associations' charter-operator members have fee-payment options, including most significantly the (j)(2) option of apportioned registration (which the Associations acknowledge passes muster under the dormant Commerce Clause), completely undercuts their argument that section 50–1501.02(j) discriminates against interstate operators or subjects them to fees that are not fully apportioned.[31]

▮▮▮ A state tax regulation may also be constitutionally impermissible if it "impose[s] burdens on interstate trade that are clearly excessive in relation to the putative local benefits."[32] *American Trucking*, 545 U.S. at 433, 125 S.Ct. 2419; *see also id.* at 434, 125 S.Ct. 2419 (upholding Michigan intrastate hauling tax where the record "contain[ed] little, if any, evidence that the $100 fee imposes any significant practical burden upon interstate trade"). Therefore, we must also consider the practical effect of section 50–1501.02(j) on interstate commerce, including what the Associations argue is the excessive burden posed by the District's switch from a charter bus reciprocity system (under which buses were allowed to enter the District, at whatever regularity, without payment of any fees to the District) to the fees mandated by section 50–1501.02(j). The statute, the Associations assert, has "the inev-

---

**31.** Nor does the possibility or likelihood that interstate charter operators overwhelmingly will choose an option other than the one chosen by in-state operators establish a Commerce Clause violation. "[A] tax levied on interstate commerce is not discriminatory, merely because the tax differs in form, or adopts a different measure of assessment, from that imposed on intrastate carriers." *Cont'l Trailways, Inc. v. Dir., Div. of Motor Vehicles*, 102 N.J. 526, 509 A.2d 769, 772 (1986).

**32.** This is so even where a statute "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental...." *Pike v. Bruce Church*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

itable effect of driving up costs for out-of-District carriers." But the fact that a participant in interstate commerce realizes an "adverse economic impact in dollars and cents ... for crossing a state boundary and thus becoming subject to another State's taxing jurisdiction" is not by itself sufficient to establish a Commerce Clause violation. *Scheiner,* 483 U.S. at 283 n. 15, 107 S.Ct. 2829. "[N]ot all burdens upon commerce, but only undue or discriminatory ones, are forbidden." *Id.* at 281 n. 12, 107 S.Ct. 2829. A state "may impose, even on motor vehicles engaged exclusively in interstate commerce, a reasonable charge as their fair contribution to the cost of constructing and maintaining the public highways." *Id.* at 286 n. 21, 107 S.Ct. 2829; *see also id.* at 292, 107 S.Ct. 2829 ("[U]sers of a State's highways, although engaged exclusively in interstate commerce, may be required to contribute to their cost and upkeep.") (citations and internal quotation marks omitted); *Maryland,* 451 U.S. at 754, 101 S.Ct. 2114 ("[I]nterstate commerce may constitutionally be made to pay its way."); *Complete Auto Transit,* 430 U.S. at 289, 97 S.Ct. 1076 ("There being no objection to Mississippi's tax on appellant except that it was imposed on nothing other than the 'privilege of doing business' that is interstate, the judgment of the Supreme Court of Mississippi [upholding the tax] is affirmed").

There is no dispute that out-of-state charter buses now must pay something to the District for infrastructure use whereas before they paid nothing, but nothing in the record before us establishes that the Associations' members are thereby faced with any undue burden. The record is likewise bereft of any evidence that section 50–1501.02(j) will have a practical effect on interstate commerce generally. The only evidence in the record of any purported burden on interstate commerce is the lone charter-operator affidavit that the Associations submitted in support of their motion for summary judgment. That affidavit, from an officer of New Jersey-based Starr Tours, Inc., states that the company has 46 buses, each of which seats between 49 and 56 passengers, for which the company estimates that District of Columbia trip permits will cost $15,000 annually. The affidavit does not state how many of the company's buses actually make trips into the District, but, spread over 46 buses and roughly 50 passengers per bus, the $15,000 in annual estimated expenditures for trip permits amounts to about $326 per year per bus—i.e., less than $1 per day per bus,[33] and possibly less than two cents per day per passenger, amounts that do not strike us as "clearly excessive." [34]

The Starr Tours affidavit further states that the company's buses drove a total of 16,655 miles in the District of Columbia in 2006, but does not state the buses' non-District mileage. Thus, although the company has given us an estimate of what annual trip permit fees might be (should it choose the subsection (j)(3) trip permit option), the record gives us no information about how much the company would pay to the District in apportioned registration

---

**33.** We note the statement in the OIG Report that industry representatives who were contacted in conjunction with preparation of the report advised that a $20 daily fee "would be incidental and would not negatively affect tourism." OIG Report at 3.

**34.** To be clear, we do not suggest that the District would have a basis for charging fees for Starr Tours buses that do not make trips into the District of Columbia; the per day, per passenger amounts we have calculated on the basis of spreading the company's $15,000 trip-permit-expenditure estimate over its entire fleet of buses is intended merely as a way of evaluating the burden of that overall estimated expense should the company choose the trip permit option.

fees should the company choose option (j)(2). We have no information about whether the apportioned-registration-fee amount would be more or less than the estimated trip permit fee amount, and, most important, no indication that the apportioned-registration-fee amount would be burdensome. Moreover, the Associations have not asserted that the fees in issue will cause their members to stop operating here or to cut back on interstate trips or to go out of business altogether.[35] In sum, the record before us "lack[s] convincing evidence showing that the tax deters ... interstate activities." *American Trucking*, 545 U.S. at 437, 125 S.Ct. 2419. Further, the Associations make no claim that section 50–1501.02(j) fails prongs one and four of the *Complete Auto* test (*see supra* note 24), and thus they appear to concede that the fees are "applied to an activity with a substantial nexus with the taxing State" and are "fairly related to the services provided by the State." *Complete Auto Transit*, 430 U.S. at 279, 97 S.Ct. 1076.

Finally, contrary to the argument that the Associations press most forcefully in reliance on *Scheiner*, the fact that the District now requires fees to be paid by charter operators "who have already paid full registration fees in their home states," does not suffice to prove a Commerce Clause violation. In *Scheiner*, the Su-

preme Court did rely on the fact that "some operators of vehicles based in other States ... have paid registration fees to their own jurisdictions and still face Pennsylvania's axle taxes." 483 U.S. at 282, 107 S.Ct. 2829. But, as the Court recognized, the real nub of the problem in Pennsylvania was that non-Pennsylvania "trucks based in IRP States are required to pay *not only their share of Pennsylvania's registration fees, but [Pennsylvania's] $25 marker fee and the axle tax as well,*" *id.* at 288 n. 22, 107 S.Ct. 2829 (italics added), while, by law, each Pennsylvania-based truck was "deemed" to have paid the $25 marker fee through its registration fee, *id.* at 281, 107 S.Ct. 2829, and the State had reduced its registration fees with the intent of "exactly offset[ing] the impact of the Axle Tax upon motor carrier vehicles registered in Pennsylvania." *Id.* at 275 n. 8, 107 S.Ct. 2829. In effect, Pennsylvania trucks paid Pennsylvania only a registration fee, while out-of-state trucks paid Pennsylvania a registration fee, a marker fee (while that fee remained in effect), and the axle tax. Here, the situation is quite different. Out-of-state charter bus operators paying the District of Columbia trip permit fee do not also pay District of Columbia registration fees, either in full or in an apportioned amount (and, conversely, operators paying registration fees are not required to pay the trip permit fee).[36]

---

**35.** Starr Tours asserts that it will pass on to its customers the additional fees, and states that it anticipates that the higher prices "will cause a loss of business to our competitors," but does not explain that assertion. Other out-of-state charter operators likewise are subject to the new fees (and presumably will likewise pass them on to customers). And, it appears, Starr Tours's competitors that are District-based operators already pay registration fees much higher than the fees that Starr Tours will be required to pay. The company's affidavit indicates that the company pays total New Jersey registration fees of less than $8,000 for all forty-six of its buses. Twenty-

two of the company's buses weigh 36,585 pounds each, ten buses weigh 35,100 pounds each, and fourteen buses weigh 30,500 pounds each. District of Columbia registration for a comparable fleet of buses would cost upwards of $50,000 per year. *See* D.C.Code § 50–1501.03(b)(2).

**36.** And, as to charter buses that will choose the (j)(2) apportioned-registration option, it seems clear that other IRP jurisdictions, too, will be required to charge them only apportioned (rather than full) registration fees. *See U-Haul Co. v. Gourley*, No. A102856, 2004 WL 2092227, *14, 2004 Cal.App. Unpub.

In moving for summary judgment and in opposing the District's motion for summary judgment, the Associations represented that there are no material facts in dispute and effectively stipulated that no discovery of additional facts was needed to enable the trial court, and this court, to rule. On the record presented, we have no basis for concluding that section 50–1501.02(j), on its face or because of its intent or its practical effect on interstate charter bus operators, discriminates against or burdens interstate commerce. We therefore affirm the judgment in favor of the District as to the Association's dormant Commerce Clause claims.

## IV. The Claimed Conflict with the IRP

 Although the Associations concede that nothing about the subsection (j)(2) apportioned-registration option violates the dormant Commerce Clause, they contend that it is not a valid option because it conflicts with the IRP and with the District of Columbia law (specifically, D.C.Code § 50–1507.02(b), which establishes that "[t]he IRP ... shall take precedence over any District of Columbia law or regulation that may be in conflict with these agreements").[37] The gist of the As-sociations' argument is that section 50–1501.02(j) and the IRP conflict because the former effectively makes apportioned registration mandatory for non-District based charter buses, while the latter affords charter buses the option to choose apportioned registration. *See* IRP art. II (excluding "a bus used in the transportation of chartered parties" from the definition of "Apportionable Vehicle," but stating that any such bus "nevertheless may be registered under the Plan at the option of the Registrant"); *see also* IRP art. II, official cmt. ("[V]ehicles not otherwise within the definition of Apportionable Vehicle may be apportioned if the registrant so chooses").

We are not persuaded by this argument. To begin with, the fact that charter operators must choose one of the fee options described in section 50–1501.02(j)—and the possibility that an operator may select the (j)(2) apportioned-registration option because it is the least burdensome among options that all are unattractive—does not render the (j)(2) option mandatory, and does not mean that the choice of apportioned registration is not really a choice or option. *Cf. Vazquez v. Merit Sys. Protection Bd.*, 296 Fed.Appx. 20, 24 (Fed.Cir. 2008) ("[T]he fact that an employee is faced with an unpleasant situation or that

LEXIS 8488, at *45 (Cal.Ct.App. Sept. 20, 2004) ("[T]he DMV was required to assess U–Haul fees pursuant to the IRP's provisions, which allowed U–Haul to select apportionment").

37. The Associations also argue that the IRP, an interstate compact to which Congress "has given its consent," constitutes federal law, and that the "conflict" between section 50–1501.02(j)(2) and the IRP also constitutes a conflict with federal law. They cite 49 U.S.C. § 31704 (2006) (prohibiting any states not participating in the IRP from "establish[ing], maintain[ing], or enforc[ing] a commercial motor vehicle registration law, regulation, or agreement that limits the operation in that State of a commercial motor vehicle that is not registered under the laws of the State, if the vehicle is registered under the laws of a State participating in the Plan"), and *Cuyler v. Adams*, 449 U.S. 433, 440, 441, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981) ("[W]here Congress has authorized the States to enter into a cooperative agreement [or has given "expressed or implied approval to an agreement the States have already joined"] and where the subject matter of that agreement is an appropriate subject for congressional legislation, the consent of Congress transforms the States' agreement into federal law under the Compact Clause"). Because we conclude that there is no conflict between section 50–1501.02(j)(2) and the IRP, we need not and do not reach the issue of whether the IRP is properly regarded as federal law.

his choice is limited to two unattractive options does not make the employee's decision any less voluntary").

In addition, we do not think the IRP can fairly be interpreted to prohibit an IRP member jurisdiction from requiring vehicles that do not otherwise fit within the definition of "apportionable vehicle" from choosing between apportioned registration and some other form(s) of registration and fee payment. Quite the contrary, the Official Commentary of the definition of "apportionable vehicle" appears to acknowledge that jurisdictions may require such choices, stating that "[v]ehicles not apportioned are subject to registration and fee payment in accordance with each Base Jurisdiction's general registration statutes." IRP art. II, official cmt. Further, where the IRP prohibits member jurisdictions from implementing particular registration requirements, it so states in plain language. *See, e.g.,* IRP art. V, § 515 ("No Member Jurisdiction shall require a Registrant of Power Units to register a number of Trailers, Semi–Trailers, or Auxiliary axles in any proportion to the Registrant's apportioned Fleet of Power Units"). The IRP contains no language that plainly prohibits a member jurisdiction from offering charter buses the option of apportioned registration as one way of satisfying the jurisdiction's mandatory program of vehicle registration or fees.

## V. Conclusion

For the foregoing reasons, we conclude that section 50–1501.02(j) contravenes neither the dormant Commerce Clause nor the IRP. Accordingly, the judgment of the Superior Court is

*Affirmed.*